# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MATTHEW DAVID MILLER,                )
                                         )
                 Plaintiff,        )
                                           )      Civil Action No. 15-1605
        v.                               )
                                           )

NATIVE LINK CONSTRUCTION,            )
LLC, *et al.*,                              )
                                           )
               Defendants.      )

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

### I.      Introduction

Pending before the court in this civil action are motions by all defendants to dismiss the Second Amended Complaint (ECF No. 82) filed by pro se plaintiff Matthew David Miller ("Miller" or "plaintiff"). For the reasons that follow, the court will grant the motions filed by defendants Native Link, LLC ("Native Link"), Pointguard Financial, PLLC ("Pointguard"), Nate Riggan ("Riggan"), JP Morgan Chase Bank, N.A. ("Chase Bank"), and Kristen Janosick ("Janosick") insofar as these defendants seek a dismissal of plaintiff's claims for lack of personal jurisdiction. The motions to dismiss filed by Melinda Thompson-Walk ("Thompson-Walk"), Patrick L. Nolan ("Nolan"), and Mitchel Paul Walk ("Walk") for lack of personal jurisdiction will be denied without prejudice.

### II.      Background Facts

This litigation stems from a business dispute that originated principally between Miller and defendants Thompson-Walk; her husband, Walk; and Nolan. Plaintiff is a resident of Allegheny County and a citizen of the Commonwealth of Pennsylvania. (*See* Second Amended

Complaint, hereafter, "SAC," ¶1.) Walk and Thompson-Walk are citizens of the State of Washington, while Nolan is a citizen of Canada. (*Id.* ¶¶5-7.)

At times relevant to this litigation, Thompson-Walk and Nolan were members of Native Link. (SAC ¶17.) Native Link is a limited liability company organized under the laws of Delaware for the purpose of "offer[ing] grant writing and consulting services for communications services and infrastructure to Native American governments." (*Id.* ¶¶ 2, 17.) Its sole members are Thompson-Walk and Nolan. (*Id.* ¶2.) Walk serves as an officer of Native Link. (*Id.* ¶6.) Thompson-Walk and Nolan, together with another third party, also formed a California corporation known as "Native Link Communications Inc." and a related entity known as "Native Link Communications (Canada) Inc." (*Id.* ¶¶18-19.)

On April 30, 2012, Miller, Thompson-Walk and Nolan formed a separate but related entity known as "Native Link Construction, LLC" (hereafter, "NL Construction"). NL Construction is a member-managed LLC organized under Delaware law for the purpose of performing installation, construction, training, engineering, and other services related to the communications industry, with a particular focus on Native American clients. (SAC ¶¶12, 16.) In May 2012, NL Construction registered with the Washington State Department as a foreign limited liability company licensed to conduct business in that state. (SAC ¶14, SAC Ex. 5, ECF No. 82-5.)

Although Miller, Thompson-Walk, and Nolan held equal one-third interests in NL Construction, the latter two individuals had minimal involvement in the company's daily operations. (SAC ¶¶12, 22.) Thompson-Walk was named as one of NL Construction's members so that the company could qualify as "Native American owned," (*id.* ¶21), and Walk, her husband, "acted at all times as a partner in [her] place." (*Id.*) The day-to-day operations and

decisions of NL Construction were carried out by Miller and Walk, who held himself out as an officer of the company. (*Id.* ¶¶21-23.)

Subsequent to NL Construction's formation on April 30, 2012, it opened a business account with Chase Bank in Spokane, Washington. (SAC ¶24.) Janosick, a small business specialist for Chase Bank, took possession of the "original LLC agreement"[1] as well as NL Construction's certificate of formation and certain other documentation required by Chase Bank. (*Id.*) Thereafter, Chase Bank, through Janosick, provided payroll and other related services for NL Construction. (*Id.*)

At some point in or after October 2013, NL Construction and Native Link hired Pointguard and its agent, Riggan, to act as the CFO of both companies on an out-sourced basis. (SAC ¶33.) Miller was not involved in this decision and was only informed about it after the fact. (*Id.*)

Beginning in November 2013, Thompson-Walk and Nolan "began treating [plaintiff] as an employee rather than a partner and making decisions without his input or approval," even though "[plaintiff] was the only partner that was an active participant in the daily operations of [NL Construction]." (SAC ¶36.) In addition, Thompson-Walk, Nolan, and Walk allegedly began misappropriating funds that were due and owing to NL Construction, using the funds to pay Native Link's obligations or depositing them into Native Link's bank account. (*Id.* ¶38.)

---

[1] It appears, based on context, that the "original LLC agreement" refers to the official, signed version of the agreement that plaintiff appended to the second amended complaint as "Exhibit 8." (*See* ECF No. 82-8.) The court notes that, while NL Construction was organized as a limited liability company, Exhibit 8 is styled as a "Partnership Agreement," and plaintiff variously refers to NL Construction's members as both "partners" and "members," using those terms interchangeably. This confusion may be due to the fact that, under the Pennsylvania's prior LLC law -- the Limited Liability Company Law of 1994, 15 PA. CONS. STAT. ANN. §§8901 et seq. (West 2013), certain aspects of the relations between members of a member-managed limited liability company, such as the right to company information, were governed by the provisions of Pennsylvania's partnership law. *See id.* §8904(a)(1) and 1994 Committee Comment to §8904. Hereafter, to avoid confusion, the court will refer to the parties' agreement as the "operating agreement."

Nolan also began using NL Construction's funds to pay for travel expenses that were unrelated to the company's business. (*Id.* ¶39.)

In early 2014, "Walk and the CFO prepared a forecast of revenues" for NL Construction which "provided for commissions to [Native Link] for projects that it was not involved in" and omitted projects for which Miller was responsible for engineering and installation services. (SAC ¶37.) When Miller subsequently learned that a revised forecast would provide Native Link an even greater share of the profits from work performed by NL Construction, he asked for NL Construction's "2013 W2's and the quick books files," but he was never provided this information. (*Id*. ¶40.)

On February 3, 2014, Miller learned that a particular project for which NL Construction had contracted would be performed by Native Link, and NL Construction would be relegated to the role of subcontractor. (SAC ¶41; SAC Ex. 38, ECF No. 82-38; SAC Ex. 39, ECF No. 82-39.) The following day, February 4, 2014, Miller learned that Native Link had hired a new electrical engineer. (*Id.* ¶42.) Although the electrical engineer was a Native Link employee, he was paid out of NL Construction's account. (*Id.*) According to Miller, this situation "placed [Native Link] in direct competition with [NL Construction], to the detriment of [plaintiff] and benefit of Melinda [Thompson-Walk], Mitchell Paul Walk, and Patrick Nolan." (SAC ¶42 and SAC Ex. 40, ECF No. 82-40.) Thereafter, Miller discovered that Native Link was advertising for a communications construction manager, another position that Miller claims would be in "direct competition" with NL Construction. (*Id.*)

On February 15, 2014, Miller was notified that a board meeting would be held the following day to review documents pertaining to a loan that Native Link would be making to NL Construction in the amount of $250,000. (SAC ¶45 and SAC Ex. 46, ECF No. 82-46.) Miller

was not provided any information about where the meeting would be held.  (*Id.*)  The following day, Walk emailed Miller, stating:  "Attached is a document electing Melinda as [NL Construction's] new manager.  Pat has signed this as well as Melinda already so please either sign or elect not to so we can move forward."  (SAC Ex. 47, ECF No. 82-47.)  The attached document was a "Waiver and Consent to Actions in Lieu of the Annual Meeting of [NL Construction]." (SAC Ex. 48, ECF No. 82-48.)  Miller construed the waiver form as a request that he "ratify and approve all financial actions of the company for 2013 and elect [Thompson-Walk] as manager."  (SAC ¶45.)  Miller viewed the request as contrary to the terms of the operating agreement, pursuant to which NL Construction was to be member-managed and "all but routine decisions" would require a unanimous vote of the members.  (*Id.*)  Miller refused to sign the waiver document because he perceived that doing so would "severely harm his interest in [NL Construction] and [he had not been] provided the requested financial documents for review before approving."  (*Id.*)

On February 19, 2014, Miller discovered that his authorization to draw funds from NL Construction's bank account at Chase Bank had been revoked, which hampered his ability to continue work on a particular construction project.  (SAC ¶46.)  That day, he spoke with Janosick, who advised him that she had revoked his access to the accounts.  (SAC ¶47.)  When Miller asked for the documentation authorizing her to do so, Janosick replied, "Ask Melinda, I don't have to tell you."  (*Id.*)

On February 24, 2014, Miller discovered that his access to NL Construction's email account had been revoked and service to his cell phone had been cancelled.  (SAC ¶48.)  That same day, he received an email and an attached letter from NL Construction purporting to terminate his "employment" with the company due to various act of alleged misfeasance.  (*Id.*

¶48 and Exs. 50 and 51, ECF Nos. 82-50 and 82-51.)  Miller denies the allegations of misfeasance and insists that he "continues to be a Member and not an employee of the company."  (*Id.* ¶48.)

In March 2014, Thompson-Walk cancelled payments on a Verizon Wireless account that had been used by NL Construction and opened in Miller's name.  (SAC ¶49.)  Miller avers that, as a result of Walk's actions, he is responsible to pay early termination charges.  (*Id.*)

That same month, Chase Bank returned "guaranteed payment checks" which Miller had attempted to draw on NL Construction's bank account.  The checks were returned unpaid "for reason Z Fraud."  (SAC ¶ 50.)

When Miller later attempted to obtain unemployment compensation benefits in Pennsylvania, he discovered that Thompson-Walk, Janosick, and Chase Bank had "failed to file employment taxes in Pennsylvania" and "fraudulently listed [plaintiff's] address on his W2" as the Walks' Washington address.  (*Id.* ¶51.)  Thereafter, NL Construction contested payment of Pennsylvania unemployment compensation benefits.  (SAC ¶51.)  Although Miller ultimately received a favorable ruling, the payment was allegedly delayed by eleven months, causing him to fall behind on his mortgage payments.  (*Id.*)

### III.    Procedural History

Plaintiff commenced this litigation on December 8, 2015, with the filing of his initial complaint (ECF No. 1), which named NL Construction, Native Link, Pointguard, JP Morgan Chase & Co., Thompson-Walk, Walk, Nolan, Riggan, and Janosick as defendants.  On February 28, 2016, plaintiff filed an amended complaint (ECF No. 48), which added Chase Bank as a defendant.  In both the original and amended complaints, the court's subject-matter jurisdiction was predicated exclusively on diversity of citizenship.

On September 8, 2016, this court entered a memorandum opinion and order dismissing the amended complaint on the grounds that it failed to establish complete diversity between plaintiff and the various defendants. (*See* ECF Nos. 80 and 81.) The court found the pleading to be deficient in several respects. First, the amended complaint named NL Construction as a defendant; this meant that complete diversity was lacking because the citizenship of NL Construction depended on the citizenship of its members, and plaintiff was one of those members. (*See* Mem. Op. at 9-10, ECF No. 80.) Second, the amended complaint failed to properly allege the citizenship of the plaintiff and the defendants who are natural persons. (*Id.* at 11-12.) Finally, the amended complaint failed to allege the citizenship of the corporate defendants and Pointguard. (*Id.* at 12-14.) Based upon these defects, the court dismissed the amended complaint without prejudice and allowed plaintiff an opportunity to replead his claims to the extent he could do so in good faith and consistent with the strictures of 28 U.S.C. §1332(a).

On September 25, 2016, plaintiff filed the second amended complaint (ECF No. 82), which is now the operative pleading in this matter. The second amended complaint dropped NL Construction and JP Morgan Chase & Co. as defendants and set forth seven claims against the remaining defendants. Count I of the second amended complaint now asserts a claim for breach of contract against Thompson-Walk, Nolan, and Walk (referred to collectively as the "NL Construction Defendants"). Count II asserts a claim of conversion against the NL Construction Defendants and Native Link. Count III asserts a claim against the NL Construction Defendants for breach of fiduciary duty. Count IV asserts a claim against Pointguard and Riggan (referred to collectively as the "Pointguard Defendants") for breach of fiduciary duty. Count V asserts a claim against the NL Construction Defendants, the Pointguard Defendants, and Native Link for

fraud.  Counts VI and VII assert claims against Chase Bank and Janosick (referred to collectively as the "Bank Defendants"), respectively, for fraud and breach of fiduciary duty.  With respect to each of the seven counts, plaintiff seeks compensatory damages in excess of $2 million as well as punitive damages.

The sole basis for this court's subject-matter jurisdiction, as before, is diversity of citizenship.  All the named defendants in this case have moved to dismiss the amended complaint.  (*See* ECF Nos. 83, 85, 87, 89.)  In general, these motions assert that plaintiff failed to establish the court's subject-matter jurisdiction, failed to establish this court's personal jurisdiction over each defendant, and failed to state claims upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6).

 "In instances where an issue of subject-matter jurisdiction is coupled with an issue of personal jurisdiction, courts should dispose of the issue of subject-matter jurisdiction before engaging with the question of personal jurisdiction unless compelling circumstances dictate otherwise." *Dickson v. Noble House Hotels & Resorts,* Civil Action No. 14-1778, 2014 WL 4493725, at *3 (E.D. Pa. Sept. 10, 2014) (citing *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 587-88 (1999)).  The court will therefore begin its analysis with the defendants' Rule 12(b)(1) challenges and then proceed, as appropriate, to address the challenges raised under Rule 12(b)(2) and 12(b)(6).

## IV.    Defendants' Rule 12(b)(1) Challenges

### A.  Standard of Review

Federal courts are courts of limited jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Jurisdictional challenges may be treated as either "facial" or as

"factual." *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357-58 (3d Cir. 2014). As an initial matter, therefore, the court must determine the type of challenge being raised.

"A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present." *Constitution Party of Pa.,* 757 F.3d at 358. "Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint." *Id.* (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 889-92 (3d Cir.1977)). A facial attack on subject-matter jurisdiction "'contests the sufficiency of the pleadings . . . .'" *Id.* (quoting *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)). When analyzing this type of challenge, "'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" *In re Schering Plough Corp.*, 678 F.3d at 243 (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). "Thus, a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Constitution Party of Pa.,* 757 F.3d at 358 (citing *In re Schering Plough Corp.*, 678 F.3d at 243).

A "factual" 12(b)(1) attack, on the other hand, challenges allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts. *Constitution Party of Pa.*, 757 F.3d at 358. When considering a factual challenge, the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations...." *Mortensen v. First Fed.*

*Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). The court may weigh and consider evidence outside the pleadings. *Constitution Party of Pa.*, 757 F.3d at 358 (internal quotation marks omitted). A Rule 12(b)(1) factual challenge thus "strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 348-50 (3d Cir. 2016)).

Here, the defendants' various jurisdictional challenges are in the nature of facial attacks on the second amended complaint. Accordingly, the court will accept plaintiff's well-pled allegations as true and will consider only the content of the second amended complaint, the exhibits attached to the second amended complaint, and matters of public record, consistent with a traditional Rule 12(b)(6) analysis. *See Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). As the party advocating federal jurisdiction, plaintiff bears the burden of demonstrating that federal subject-matter jurisdiction exists. *See Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993) ("The person asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of the litigation.") (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

### B. Analysis

As previously noted, the court's sole basis for exercising subject-matter jurisdiction is diversity of citizenship under 28 U.S.C. §1332(a). (*See* SAC ¶10.) To establish jurisdiction under §1332(a), there must be complete diversity as between the two sides in a dispute. *See*

*Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (diversity of citizenship jurisdiction applies when "the citizenship of each plaintiff is diverse from the citizenship of each defendant."); *see also Bumberger v. Ins. Co. of N. Am.*, 952 F.2d 764, 767 (3d Cir. 1991) ("'[D]iversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff.'") (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (alteration and emphasis in original)).

The Pointguard Defendants move to dismiss the second amended complaint on the grounds that NL Construction is the real party in interest or an indispensable party to this action whose presence destroys complete diversity of jurisdiction. The Bank Defendants separately assert a lack of subject-matter jurisdiction based upon plaintiff's failure to plead properly the citizenship of Chase Bank. The court will address these issues in reverse order.

1. <u>Chase Bank's Citizenship</u>

In dismissing plaintiff's first amended complaint, this court observed that, among other things, the pleading failed to include any averments regarding the principal place of business of Chase Bank. The court noted that "JP Morgan Chase Bank NA may be a national bank as indicated in its name, *i.e.* 'NA'; if so, its citizenship for diversity purposes is 'the state in which its main office, as designated in its articles of association, is located.'" (Mem. Op. at 12, ECF No. 80 (citing 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3627 at 169 (3d ed. 2009))); *see* 28 U.S.C. §1348 ("All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the states in which they are respectively located."); *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) (holding that "a national bank, for §1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located").

Here, plaintiff alleges that Chase Bank is "a wholly-owned subsidiary of JP Morgan Chase & Co., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the [S]tate of New York." (SAC ¶4.) Although this averment may be sufficient to plead the citizenship of the parent holding corporation, it is insufficient to plead the citizenship of Chase Bank.

Nevertheless, in the interests of justice and to expedite these proceedings, this court will take judicial notice of the fact that the main office of Chase Bank is located in Columbus, Ohio, as set forth in its articles of incorporation, which are available to the public at the U.S. Securities and Exchange Commission's website. *See* https://www.sec.gov/Archives/edgar/data/1062336/000119312504207055/dex991.htm; *see also* Fed. R. Evid. 201(b)(2) (allowing the courts to take judicial notice of adjudicative facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").[2] It follows that Chase Bank is a citizen of the State of Ohio, a conclusion that numerous other courts have reached as well. *See Pipala v. JP Morgan Chase Bank NA*, No. 16 CV 3723 (VB), 2016 WL 7378979, at *1 (S.D.N.Y. Dec. 20, 2016) (court noting, for purposes of establishing diversity-of-citizenship jurisdiction, that "prior cases from this district have found Chase to be a citizen of Ohio") (citing *Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A.*, 470 F. Supp. 2d 312, 313 (S.D.N.Y. 2006)); *Collins-Hardin v. WM Specialty Mortg., LLC*, No.

---

[2] A number of federal district courts in other jurisdictions have similarly taken judicial notice of facts that established a party's citizenship for purposes of 28 U.S.C. §1332. *See, e.g., Swindol v. Aurora Flight Sciences Corp.*, 805 F.3d 516, 519 (5th Cir. 2015) (examining public records contained on the Mississippi Secretary of State's and the Virginia State Corporation Commission's websites in order to determine appellate court jurisdiction and concluding "that the accuracy of these public records ... cannot reasonably be questioned"); *Bower v. Foster Farms*, No. 115-CV-00079-GEB-SAB, 2015 WL 1275303, at *3 (E.D. Cal. Mar. 19, 2015), *appeal dismissed* (July 29, 2015) (concluding that diversity jurisdiction was lacking based on judicially noticed information from the California Secretary of State's website concerning corporation's citizenship); *Tocci v. Antioch Univ.*, 967 F. Supp. 2d 1176, 1193 n. 6 (S.D. Ohio 2013), *aff'd*, Case No. 13-4123 (6th Cir. June 10, 2014) (concluding that Antioch University is a citizen of Ohio based on the judicially noticed fact that the University is registered with the Ohio Secretary of State as a non-profit corporation with its principal place of business in Ohio) (citing *Arvest Bank v. Byrd*, 814 F. Supp. 2d 775, 787 (W.D. Tenn. 2011) (taking judicial notice of the plaintiff's registration on the Arkansas Secretary of State website for the purpose of analyzing diversity of citizenship jurisdiction)).

12 C 50099, 2015 WL 3505188, at *1 (N.D. Ill. June 3, 2015) (court noting, for jurisdictional

purposes, that "JP Morgan Chase Bank, N.A. [is] a national banking association, with its main

office in Ohio"), *motion for relief from judgment denied*, No. 12 C 50099, 2015 WL 5664900

(N.D. Ill. Sept. 24, 2015); *McMullen v. JP Morgan Chase Bank*, No. 13–cv–087–RHW, 2013

WL 6096503 (E.D. Wash. Nov. 20, 2013) (holding that defendant JPMorgan Chase Bank was a

national banking association organized under the laws of Ohio with its main office in Columbus,

Ohio; thus, for the purpose of establishing diversity, it was considered a citizen of Ohio); *Haynes*

*v. JPMorgan Chase Bank, N.A*., No. 11–13858, 2011 WL 4595271, *1 (E.D. Mich. Oct. 3, 2011)

(same).

The averments in the second amended complaint state that plaintiff is a citizen of the

Commonwealth of Pennsylvania. Because no defendant identified in the second amended

complaint is a citizen of Pennsylvania, complete diversity exists. The amount in controversy,

exclusive of interests and costs, exceeds $75,000. Therefore, this court has subject-matter

jurisdiction over the instant litigation pursuant to 28 U.S.C. §1332, unless – as the Pointguard

Defendants argue -- NL Construction's citizenship must be factored into the diversity analysis.

If it must, then complete diversity is lacking.

### 2.  Plaintiff's Failure to Join NL Construction

The Pointguard Defendants argue that plaintiff's claims are essentially in the nature of a

derivative action brought on behalf of NL Construction and, therefore, since NL Construction is

the "real party in interest," its citizenship must be factored into the diversity analysis. Relatedly,

the defendants contend that NL Construction is an indispensable party whose joinder defeats

diversity jurisdiction.

a) RULE 17

Federal Rule of Civil Procedure 17(a) provides that federal civil actions "must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). For purposes of determining whether complete diversity exists, a court generally "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460-461 (1980); *see Choi v. Kim*, 50 F.3d 244, 246 (3d Cir.1995) (In considering whether it had diversity jurisdiction, the district court "was required to decide who was the real party in interest under Rule 17(a) of the Federal Rules of Civil Procedure.") (citing authority); *ABI Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, No. 91-6785, 2016 WL 3959078, at *15 (E.D. Pa. July 22, 2016) (court must rest diversity analysis upon the citizenship of real parties to the controversy, while disregarding nominal or formal parties)(citing *Navarro,* 446 U.S. at 461). For purposes of this analysis, "'[t]here may be multiple real parties in interest for a given claim, and if the plaintiffs are real parties in interest, Rule 17(a) does not require the addition of other parties also fitting that description.'" *ABI Jaoudi & Azar Trading Corp.,* 2016 WL 3959078, at *15 (quoting *HB Gen. Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1196 (3d Cir. 1996)).

To conduct its Rule 17(a) analysis, the court must determine which party has the enforceable substantive right under relevant state law. *See Feriozzi Co., Inc. v. Ashworks, Inc.,* 130 F. App'x 535, 539 (3d Cir. 2005) (noting that Rule 17(a) "ensures that under the 'governing substantive law, the plaintiffs are entitled to enforce the claim at issue'") (quoting *HB Gen. Corp.,* 95 F.3d at 1196); *McAndrews Law Offices v. Sch. Dist. of Phila.,* Case No. 06-CV-5501, 2007 WL 515412, at *2 (E.D. Pa. Feb. 9, 2007) ("Where the question involved is whether a plaintiff is a real party in interest under Federal Rule of Civil Procedure Rule 17(a), a federal

court will first look to state law to determine who has a substantive right of action.") (citing *American Fidelity & Casualty Co. v. All American Bus Lines, Inc.* 179 F.2d 7 (10th Cir. 1949)).

As a threshold matter the court must determine *which* state's law will apply for purposes of determining the relevant substantive rights. The laws of several different states are potentially relevant because plaintiff is a citizen of Pennsylvania, while NL Construction and Native Link are both Delaware LLCs, and many of the named defendants are citizens of Washington.[3]

To make its determination, the court must apply Pennsylvania choice of law rules. *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,* 134 S. Ct. 568, 582, (2013) ("A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 494–49 (1941)). Complicating matters is the fact that plaintiff sued the various defendants under theories sounding in both contract and tort, and the relevant choice of law may differ among the various claims asserted in this lawsuit. *See Young v. Home Depot U.S.A.*, No. 15-CV-5436, 2016 WL 8716423, at *4 (E.D. Pa. Sept. 30, 2016) (observing that the choice of law analysis is "issue-specific" and the court must examine whether "different states' laws apply to different issues in a single case") (internal quotation marks and citation omitted).

### (i)     *Plaintiff's Contract Claim Against the NL Construction Defendants*

Under Pennsylvania choice-of-law rules, "the first question to be answered in addressing a potential conflict-of-laws dispute is whether the parties explicitly or implicitly have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999). As a general matter, Pennsylvania courts apply the state law that the parties have agreed upon. *See*

---

[3] Although Nolan is alleged to be a citizen of Canada, the court will not include Canadian law within its choice of law analysis because, based upon the second amended complaint and appended exhibits, the court does not perceive that Canada would have a substantial interest in the application of its laws to this civil action.

*Gay v. Creditinform,* 511 F.3d 369, 389 (3d Cir. 2007) ("'Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.'")(quoting *Kruzits v. Oluma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994)).

Pennsylvania courts have adopted section 187 of the Restatement, Second, Conflict of Laws, pursuant to which a choice-of-law provision will be enforced:

> "unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . ."

*Gay,* 511 F.3d at 389-390 (quoting *Kruzits,* 40 F.3d at 55) (ellipsis in the original); *see Young v. Home Depot U.S.A.*, No. 15-CV-5436, 2016 WL 8716423, at *4 (E.D. Pa. Sept. 30, 2016).

Here, plaintiff's breach of contract claim against the NL Construction Defendants is predicated upon the NL Construction Defendants' alleged violations of the underlying operating agreement. (*See* SAC ¶¶52-60.)[4] Plaintiff claims that the NL Construction Defendants breached the agreement by: (i) failing to provide him with the company's financial records and annual tax returns (SAC ¶¶54, 55), (ii) failing to give him advance written notice of their intent to enter into a loan agreement (*id.* ¶56), (iii) failing to make "guaranteed weekly payments of $1,400.00 from 2/14/14 to the present" (*id.* ¶57), and (iv) failing to distribute the company's profits (*id.* ¶58).

Relevantly, paragraph 20 of the operating agreement contains an express choice of law provision, which provides: "[t]his agreement will be governed by and construed in accordance

---

[4] The court notes that the operating agreement appended to the second amended complaint does not appear to include Walk as a contracting party. (*See* SAC Ex. 8, ECF No. 82-8.) Accordingly, the claim against Walk may ultimately fail for lack of any contractual duty on his part. Without definitively prejudging this issue, the court recognizes that plaintiff is the master of his own complaint and, since he included Walk as a party being sued under Count I of the second amended complaint, the choice of law provision in the agreement will be applied to the breach of contract claim against Walk.

with the laws of the state of Delaware." (SAC Ex. 8, ¶20, ECF No. 48-8.)[5] Consistent with

Pennsylvania choice-of-law principles, Delaware law should determine whether plaintiff has

enforceable rights relative to any breach of the operating agreement. Delaware has a substantial

relationship to the parties who are being sued in Count I because each of the named defendants is

either a member or an officer of NL Construction, a Delaware LLC. The alleged contractual

breaches concern conduct undertaken in the NL Construction Defendants' capacities as members

or officers of that LLC. The rights upon which plaintiff is suing are ostensibly derived from the

operating agreement, which is to be construed and governed in accordance with Delaware law.

It does not appear that either Washington or Pennsylvania would have a materially greater

interest in the resolution of Count I as compared to Delaware.

Application of Delaware law would not offend the fundamental policy interests of either

Washington or Pennsylvania. Washington's Limited Liability Company Act expresses a policy

interest in "giv[ing] the maximum effect to the principle of freedom of contract and to the

enforceability of limited liability company agreements." WASH. REV. CODE §25.15.801(2).

Pennsylvania's Uniform Limited Liability Company Act of 2016 ("ULLCA"), 15 PA. CONS.

STAT. §§8811 *et seq.*, grants parties considerable flexibility in the crafting of their operating

agreements. *See generally id.* §8815(d). In addition, both jurisdictions recognize that a business

entity's internal operations should be governed by the law of the state where the company was

formed (which, in this case, would be Delaware). *See Rodriguez v. Loudeye Corp.*, 189 P.3d

---

[5] Neither plaintiff nor any defendant addressed this provision or its enforceability in the present case. Matters are
further complicated because the copy of the agreement that is appended to the second amended complaint is
unsigned. Nevertheless, for present purposes, the court will credit plaintiff's averment that Janosick "was presented
with the original LLC agreement, certificates, and other documentation" and "has maintained possession of these
items." (SAC ¶24.) From this allegation, it can reasonably be inferred that a signed and enforceable version of the
parties' operating agreement exists and that it governed the relationship between and among the company's
members. Because defendants did not raise any challenge to the operating agreement's choice of law provision, the
court will infer for present purposes that the provision is both valid and enforceable.

168, 172 (Wash. Ct. App. 2008) ("Shareholder claims involving a corporation's internal affairs are governed by the law of the state in which the corporation was incorporated.")(citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir.1985)); 15 PA. CONS. STAT. §402(a)(1) ("The laws of the jurisdiction of formation of a foreign association governs the . . . internal affairs of the association.").  Accordingly, the court will apply Delaware law in assessing plaintiff's substantive rights under Count I.

As discussed, the Pointguard Defendants' Rule 17 challenge is based upon the theory that NL Construction, rather than plaintiff, is the real party in interest to this litigation because plaintiff's claims are derivative in nature.  Under Delaware law, the distinction between direct and derivative claims turns on the resolution of two questions:  "(1) who suffered the alleged harm (the [business entity] or the [plaintiff], individually); and (2) who would receive the benefit of any recovery or other remedy (the [business entity] or the [plaintiff], individually)?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033, 1039 (Del. 2004).  "[Any] claimed direct injury must be independent of any alleged injury to the [business entity]."  *Id.* at 1039.  "The [plaintiff] must demonstrate that the duty breached was owed to [him] and that he . . . can prevail without showing an injury to the [business entity]."  *Id.*

Applying these standards, the court concludes that plaintiff's breach of contract claims are direct claims.  Assuming that plaintiff can establish a right to receive copies of NL Construction's financial records, copies of tax returns, and advance written notice of any intended loan obligations, the deprivation of these rights was personal to him and directly harmed him.  The same is true with respect to the NL Construction Defendants' alleged failure to make "guaranteed weekly payments" and to distribute company profits.  Were these payments to

be recovered, they would be payable to plaintiff, not NL Construction. Plaintiff is therefore the real party in interest for purposes of Count I.

*(ii)*      *Plaintiff's Tort Claims*

The choice of law provision in the company's operating agreement raises a question about its relevance in the context of plaintiff's remaining tort claims. Under Pennsylvania law, a contractual choice of law provision "do[es] not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship." *Broederdorf v. Bacheler*, 129 F. Supp. 3d 182 (E.D. Pa. 2015) (internal quotation marks and citation omitted). In this case, the provision indicates a narrow intent, as it provides only that the "agreement will be governed by and construed in accordance with the laws of the state of Delaware." (SAC Ex. 8, ¶20, ECF No. 82-8.) "Narrow choice of law provisions stating that a contract's terms or enforcement are to be governed, or construed, by the laws of another state are generally interpreted by Pennsylvania courts to relate only to the construction and interpretation of the contract at issue." *Grimm v. Citibank (S. Dakota), N.A.*, No. CIV.A. 08-788, 2008 WL 4925631, at *4 (W.D. Pa. Nov. 14, 2008) (citing *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569 (E.D.Pa.1994)); *accord Coram Healthcare Corp. v. Aetna U.S. Healthcare Inc.*, 94 F. Supp. 2d 589, 594 (E.D. Pa.1999) (choice of law provision that stated "[t]his agreement shall be governed by the state of Delaware" applied only to claims relating to parties' rights and duties under the contract itself).

In light of these principles, the contractual choice of law provision has no application to plaintiff's tort claims against the NL Construction Defendants. The choice of law provision also does not apply to the tort claims against Native Link, the Pointguard Defendants, and the Bank Defendants, since these defendants were not parties to the operating agreement. Consequently, to

determine the applicable law for Counts II through VII, the court must undertake a more traditional analysis.

Under Pennsylvania's choice of law rules, when no choice of law provision governs what law to apply in a dispute, the first step is to determine "whether a conflict exists between the laws of [the competing states]." *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. Ct. 2006) (citation omitted). If there is no conflict between the laws of competing states, no further analysis is necessary and the law of the forum state applies. *See, e.g., State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 F. App'x 182, 185 n.1 (3d Cir. 2006) (citation omitted) ("[B]ecause there is no conflict between the laws of other states that may have an interest . . . a court shall apply the law of the forum state.").

When there are relevant differences between the competing states' laws, courts must examine the governmental policies underlying each law and classify the conflict as "true," "false," or "unprovided for." *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). A false conflict occurs when "'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.'" *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996) (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)). When a false conflict exists, courts apply the law of the only interested jurisdiction. *See Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir. 2005) (citation omitted). A case is considered to be unprovided for "when no jurisdiction's interests would be impaired if its laws were not applied." *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005). In unprovided for tort cases, courts use the *lex loci delicti*, or "place of the wrong" rule, and apply the law of the state where the harm occurred. *Id.* (citation omitted)

A true conflict occurs when "*both* jurisdictions' interests would be impaired by the application of the other's laws." *Hammersmit*h, 480 F.3d at 230 (emphasis in original) (citations omitted). When a true conflict exists, a court must decide which state has the "greater interest in the application of its law." *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970). Pennsylvania courts do this by considering the factors set forth in the Second Restatement of Conflict of Laws. *See Griffith v. United Air Lines, Inc*., 203 A.2d 796, 805-06 (Pa. 1964); *see also Troxel v. A.I. duPont Inst*., 636 A.2d 1179, 1180-81 (Pa. Super. Ct. 1994). These factors include:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §6 (1971).

For purposes of the pending motions, the court must determine: (i) whether Delaware, Pennsylvania, and Washington would characterize any part of plaintiff's tort claims as derivative; (ii) whether these jurisdictions would recognize plaintiff as the real party in interest relative to such claims, and (iii) how Pennsylvania law would resolve any conflicts that may exist among the various jurisdictions in this regard. The court's analysis begins with a determination about how each state would characterize the claims in question: *i.e.,* direct versus derivative.

As noted, Delaware courts focus on the nature of the wrong and the party to whom the requested relief should go. *Tooley,* 845 A.2d at 1039. To state a direct claim under Delaware law, the injury to the plaintiff must be independent of any alleged injury to the business. *Id.* Pennsylvania and Washington follow this same standard. *See* 15 PA. CONS. STAT. §8881(b) ("A member maintaining a direct action under this section must plead and prove an actual or

threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company."); *J.R. Simplot Co. v. Washington Potato Co*., No. C16-1851RSM, 2017 WL 1364576, at *3 (W.D. Wash. Apr. 14, 2017) ("[A] claim is direct where injury to an LLC member 'is not solely the result of an injury suffered or threatened to be suffered' by the LLC . . . . An injury is derivative where injury to the LLC member arises from an injury inflicted on an LLC.")(internal citations omitted).

In distinguishing between derivative and direct claims, each of the three jurisdictions focuses on the substance of the plaintiff's allegations rather than the manner in which the claim is characterized. *See In re Syncor lnt'l Corp. Shareholders Litig.,* 857 A.2d 994, 997 (Del. Ch. 2004) (courts applying *Tooley* "look at the nature of the wrong alleged, not merely at the form of the words in the complaint"); *J.R. Simplot Co.,* 2017 WL 1364576, at *4 ("Although labeled as 'direct,' the Court finds that six of [plaintiff's] 'direct' claims are actually derivative claims."); *Resh v. Bortner,* Civil Action No. 16-02437, 2016 WL 6834104, at *5 (E.D. Pa. Nov. 21, 2016) ("Under Pennsylvania law, . . . the court is to perform an independent inquiry to determine whether the action is direct or derivative in nature[,]" and, in so doing, "the court is to disregard the plaintiff's designation or stated intention and instead independently examine the body of the complaint, the nature of the injury alleged, and the relief sought.")(citations omitted).

Applying these concepts to the facts at hand, it is evident that most of plaintiff's tort claims are at least partly derivative in nature. Count II sets forth a claim against Thompson-Walk, Nolan, Walk, and Native Link for alleged conversion. The claim is based partly on the allegation that the defendants "wrongfully misappropriated and usurped assets and opportunities belonging to [NL Construction] for their own benefit and to Plaintiffs [sic] detriment, in violation of Plaintiff's property rights." (SAC ¶64.) This claim is clearly a derivative one

because the harm to plaintiff occurred only as a result of harm that was inflicted on NL Construction, and any recovery would go to the company in the first instance.

Count III sets forth a claim against Thompson-Walk, Nolan, and Walk for alleged breach of fiduciary duty. Therein, plaintiff alleges that the NL Construction Defendants "breached their fiduciary duty to Plaintiff Miller by the acts of misfeasance and malfeasance described herein, . . . ." (SAC ¶72.) Plaintiff's claims in Count II are derivative claims to the extent the alleged "misfeasance and malfeasance" consisted of the NL Construction Defendants:

- causing Native Link to invoice clients for work performed by and contracted to NL Construction (SAC ¶38);

- depositing funds from NL Construction's invoices into Native Link's account and using those funds to pay Native Link's obligations (SAC ¶38);

- using NL Construction's funds to pay for travel expenses that were unrelated to NL Construction's business (SAC ¶39);

- causing Native Link to appropriate projects that had been contracted to NL Construction and relegating NL Construction to the role of subcontractor (SAC ¶41);

- causing Native Link to hire an engineer and paying him out of NL Construction's account (SAC ¶42); or

- allowing Native Link and other related companies to use the quick books subscription that NL Construction had paid for (SAC ¶43).

In each of these instances, the harm from the alleged misconduct was inflicted directly on NL Construction in the first instance, and any compensation for the misappropriated funds and business opportunities would go to the company.

Count IV sets forth a breach of fiduciary duty claim against the Pointguard Defendants arising out of the Pointguard Defendants' conduct while acting as NL Construction's "CFO." (SAC ¶75.) Plaintiff alleges that the Pointguard Defendants owed him a fiduciary duty and breached this duty, in part, by failing to provide him with the company's financial records and

annual tax returns. (SAC ¶¶76, 78.) These allegations constitute a direct claim in that they harmed plaintiff personally and did not necessarily harm the company. Other aspects of the claim are derivative. Plaintiff avers that the Pointguard Defendants "fil[ed] tax returns that were prepared to benefit Native Link, LLC to the detriment of [NL Construction]." (SAC ¶77.) Plaintiff also asserts that the defendants "provid[ed] business advise [sic] to Melinda [Thompson-Walk], Patrick Nolan and Native Link, LLC to their benefit and the detriment of Native Link Construction, LLC." (SAC ¶80.) These aspects of plaintiff's claim are plainly derivative of claims that NL Construction would hold.

Count V sets forth claims against Thompson-Walk, Nolan, Walk, Native Link, and the Pointguard Defendants for alleged fraud. The claims are direct to the extent they allege that certain company documents were fraudulently withheld from him. (*See* SAC ¶¶84-92.) The claims, however, are derivative to the extent they are predicated on those defendants' alleged involvement in: allowing or causing Native Link to misappropriate checks that were written to NL Construction (SAC ¶95), and transferring funds in excess of $10,000.00 out of NL Construction's account without the approval of all the company's members (SAC ¶96). These latter allegations involve harm to the company for which it would be entitled to recover damages.

Counts VI and VII set forth claims against the Bank Defendants for alleged fraud and breach of fiduciary duties. Here again, the fraud claim is predicated, in part, on those defendants' alleged involvement in allowing Thompson-Walk and Native Link to misappropriate checks that were written to NL Construction (SAC ¶101), and transferring funds in excess of $10,000.00 out of NL Construction's account without the approval of all the company's members (SAC ¶102). As noted, these allegations state derivative claims.

In sum, whether the second amended complaint is analyzed under the laws of Delaware, Washington, or Pennsylvania, most of plaintiff's tort claims would be classified as derivative, at least in part. The question therefore becomes how, if at all, the three interested jurisdictions would differ in their treatment of plaintiff's derivative claims and specifically, whether each jurisdiction would recognize a right of enforcement.

Under Delaware law, "[a] member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is not likely to succeed*." 6 Del. C. § 18–1001 (emphasis supplied). Washington's rule for derivative actions is similar to Delaware's. *See* WASH. REV. CODE §25.15.386 ("A member may bring a derivative action to enforce a right of a limited liability company if: (1) The member first makes a demand on the members in a member-managed limited liability company . . . requesting that they cause the limited liability company to bring an action to enforce the right, and the . . . other members do not bring the action within a reasonable time; or (2) A demand would be futile."). Thus, under either the law of Delaware or Washington, plaintiff would have standing to assert claims on behalf of NL Construction if he pled facts sufficient to make a plausible showing that it would be futile for him to demand that the other LLC members file suit on the company's behalf. Viewing the second amended complaint in the light most favorable to plaintiff, the court is satisfied that he has done so.

Pennsylvania applies a somewhat stricter standard. Under the ULLCA as it relates to this case, a member in a member-managed LLC can bring a derivative action only if the plaintiff/member first makes a formal demand on the other members to cause the company to file

suit and the company fails to do so within a reasonable period of time following the demand. *See* 15 PA. CONS. STAT. §8882(a)(1)(i). The demand "must be in record form and give notice with reasonable specificity of the essential facts relied upon to support each of the claims made in the demand." *Id.* §8882(c). The demand requirement is excused "only if the plaintiff makes a specific showing that irreparable harm to the limited liability company would otherwise result." *Id.* §8882(b)(1). When excused, the demand "should be made promptly after commencement of the action." *Id.* §8882(b)(2). Here, the second amended complaint and appended exhibits provide no basis for concluding that plaintiff satisfied the requirements for standing to pursue a derivative action under the ULLCA, and plaintiff offers no argument to the contrary.[6]

In light of these circumstances, the law of Pennsylvania as it relates to this case is ostensibly in conflict with the laws of Delaware and Washington; however, any "conflict" in this regard is a false one because only Delaware's governmental interests would be impaired if its rules for derivative standing were not applied. Relevantly, Delaware, Washington and Pennsylvania all adhere to the "internal affairs" doctrine, which holds that courts will resolve disputes involving a business entity's internal affairs in accordance with the law of the state of the entity's formation. *See* 15 PA. CONS. STAT. §402(a)(1) ("The laws of the jurisdiction of formation of a foreign association governs the . . . internal affairs of the association."); *Xcell Energy and Coal Company, LLC v. Energy Investment Group, LLC*, C.A. No. 8652-VCN, 2014 WL 2964076, at *5 (Del. Chancery Ct. June 30, 2014) ("In deciding disputes between and

---

[6] Instead, plaintiff contends that "[i]n cases of fiduciary claims arising out of the management of member-managed LLCs, a direct action is appropriate" because "in member-managed LLCs, the members owe one another the same fiduciary duties owed between partners." (Pl.'s Resp. Opp. Defs.' Mot. Dismiss SAC at 2, ECF No. 92.) Plaintiff's argument in this regard is predicated on a statutory provision that has since been repealed. (*See id.* (quoting 15 PA. CONS. STAT. §8904(a)(1)).) As of April 1, 2017, the ULLCA in its current form became generally applicable to all limited liability companies. *See* 15 PA. CONS. STAT. §8811(c). Although the ULLCA still recognizes duties of loyalty and care as between members in a member-managed LLC, *see* 15 PA. CONS. STAT. §8849.1, the ULLCA now limits the circumstances under which members can sue each other for derivative injuries, as set forth above. *See id.* §§8881 and 8882.

among corporate actors, Delaware subscribes to the internal affairs doctrine, a conflict of laws principle under which the internal affairs of a corporate entity are governed by the laws of the state of incorporation or, for an LLC such as Xcell, the state of formation.") (citations omitted); *Rodriguez v. Loudeye Corp.*, 189 P.3d 168, 172 (Wash. Ct. App. 2008) ("Shareholder claims involving a corporation's internal affairs are governed by the law of the state in which the corporation was incorporated."); WASH. REV. CODE §23.95.500 ("This chapter does not authorize this state to regulate the organization or internal affairs of a foreign entity registered to do business in this state. . . .").

In this case, all of plaintiff's claims are predicated on alleged misconduct that was undertaken by the NL Construction Defendants, the Pointguard Defendants or the Bank Defendants while these parties were acting in their respective capacities as members, officers or alleged agents of NL Construction. The claims arise out of the internal affairs of NL Construction insofar as they concern the relations between and among NL Construction, its members, its officers, and its agents. *See* Restatement (Second) of Conflicts of Laws §313 (1971)("a corporation's internal affairs are involved whenever the issue concerns the relations inter se of the corporation, its shareholders, directors, officers or agents . . . ."). Because NL Construction is a Delaware limited liability company, the law of all three competing jurisdictions requires that this court look to Delaware law to resolve plaintiff's derivative claims.

Under Delaware law, as noted, plaintiff has standing to assert his derivative claims because he has pled sufficient factual content to plausibly establish that it would have been futile for him to demand that Thompson-Walk and Nolan agree to file suit on behalf of the company. Given this conclusion, plaintiff is a real party in interest with respect to his derivative claims.[7]

---

[7] The court would reach this same conclusion even if it could be said that a true conflict exists between the laws of Pennsylvania and the other two jurisdictions. In this court's view, Washington and Delaware have a greater interest

This conclusion is in line with the holding of *HB General Corporation v. Manchester Partners, L.P.,* 95 F.3d 1185, 1196 (3d Cir. 1996). In that case, the Court of Appeals for the Third Circuit addressed the application of Rule 17(a) in the context of a declaratory judgment action brought by members of a small limited partnership that consisted of one general partner and two limited partners. The lawsuit involved claims by the general partner and one of the limited partners (collectively, the "HB entities") that the second limited partner had breached the partnership agreement by failing to meet a capital call requirement. In discussing Rule 17(a)'s application, the court noted that "[t]he real party in interest rule ensures that under the governing substantive law, the plaintiffs are entitled to enforce the claim at issue." *Id.* "Thus, insofar as the HB entities [were] authorized to bring suit under Delaware law – even derivatively or otherwise on behalf of the Partnership – they [were] also real parties in interest." *Id.* at 1197. The court explained that the "'modern function of [Rule 17(a)] . . . is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata.'" *Id.* (quoting Fed. R. Civ. P. 17 Advisory Committee Notes to the 1966 Amendment). Because the partnership consisted only of three entities (i.e., the two plaintiffs and the defendant limited partner), all of whom were before the court, "any doubt as to the preclusive effect of [the] litigation on the Partnership [could] be

---

than Pennsylvania in the application of their laws relative to the enforcement of plaintiff's derivative claims, and both Washington and Delaware would recognize plaintiff as a real party in interest. The derivative claims at issue here are being asserted on behalf of a Delaware limited liability company for alleged misconduct on the part of its own insiders, as well as alleged misconduct by a related Delaware LLC. Almost all the individual defendants reside in Washington State, and most of the events which form the basis of plaintiff's claims occurred in Washington. To the extent Pennsylvania has an interest in protecting its own citizens, that goal will be better achieved by the application of Delaware or Washington law, which provide plaintiff an enforceable right of action on his derivative claims. Finally, for purposes of this case, the Delaware/Washington rule for derivative standing is in line with the state of Pennsylvania's rule for derivative actions as it existed at the time that the alleged misconduct occurred. Under the previous version of Pennsylvania's derivative standing rule, plaintiff likely would have a right of action here. *See* 15 PA. CONS. STAT. ANN. §8992(1) (West 2013) (allowing a member of an LLC to file suit in the name of the company if authorized by voting members "*who do not have an interest in the outcome of the suit that is adverse to the interest of the company*")(emphasis supplied). In sum, considerations such as the protection of justified expectations, the predictability and uniformity of result, and ease in determining the applicable law, all favor the application of the Delaware/Washington rule recognizing plaintiff's right to assert derivative claims in this case.

resolved by protective provisions in the judgment." *Id.* The court therefore held that the HB entities were the real parties in interest for purposes of Rule 17(a). *Id.* at 1188.

The ruling in *HB General Corporation* is instructive for present purposes because the small limited partnership at issue in that case is analogous to the small member-managed LLC at issue here (namely, NL Construction). The limited partnership in *HB General Corporation*, like NL Construction, consisted of only three members. As in *HB General Corporation,* all members of the business entity are presently before the court and, therefore, "any doubt as to the preclusive effect of this litigation on [NL Construction] can be resolved by protective provisions in the judgment." *Id.* at 1197. Because Delaware law affords plaintiff the right to assert both direct claims on his own behalf and derivative claims on behalf of NL Construction, he is the real party in interest for purposes of Rule 17(a). As the court instructed in *HB General Corporation,* "[t]here may be multiple real parties in interest for a given claim, and if the plaintiffs are real parties in interest, [the rule] does not require the addition of other parties also fitting that description." 95 F.3d at 1196. Accordingly, Rule 17(a) does not require the joinder of NL Construction to this litigation or the citizenship of NL Construction to be factored into the diversity analysis. *See Navarro Sav. Ass'n,* 446 U.S. at 460-461 (noting that, for purposes of determining whether complete diversity exists, courts "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy").

b) RULE 19

Even if joinder is not required under Rule 17, the Pointguard Defendants argue that NL Construction must be joined as an indispensable party for purposes of Rule 19. Federal Rule of Civil Procedure 19(a)(1) sets forth the standard that is used to determine whether it is necessary to join an absent party. The court is required to first determine if NL Construction is a "required

party" that should be joined if feasible under Rule 19(a); if it is, then the court must evaluate whether joinder of NL Construction is feasible or whether, alternatively, the matter should be dismissed under Rule 19(b). *See General Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313 (3d Cir. 2007).

Rule 19(a) provides in pertinent part:

> **(1) Required Party**. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> > **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
> >
> > **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> >
> > > **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
> > >
> > > **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Because the subsections of Rule 19(a)(1) are stated in the disjunctive, if either subsection is satisfied, the absent party is a necessary party that should be joined if feasible. *See Gen. Refractories*, 500 F.3d at 312 (citation omitted).

Here, the court concludes that NL Construction is a party that should be joined if feasible. The company clearly has an interest in this litigation insofar as plaintiff has alleged that the defendants misappropriated the company's funds or pecuniary opportunities. These alleged injuries harmed the company directly and NL Construction would be entitled to any recovery that plaintiff might obtain. In light of NL Construction's interest in the litigation, Rule 19(a)(2) ostensibly requires its joinder if joinder would be feasible. To the extent plaintiff is asserting derivative claims, NL Construction could theoretically assert those same claims against the defendants at another time, thus exposing the defendants to a "risk of incurring double, multiple,

or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(2)(ii). Alternatively, NL

Construction's claims might be extinguished in this litigation by plaintiff. Fed. R. Civ. P.

19(a)(2)(i); *see HB Gen. Corp.,* 95 F.3d at 1190.

Of course, NL Construction's joinder is *not* feasible here because it would destroy

complete diversity. The court must therefore determine whether, "in equity and good

conscience," the company is "indispensable." Fed. R. Civ. P. 19(b). If NL Construction is an

indispensable party, the action must be dismissed.

Pursuant to Rule 19(b), the court is to consider several factors in deciding whether a party

is indispensable:

>   **(1)** the extent to which a judgment rendered in the person's absence might
>   prejudice that person or the existing parties;
>
>   **(2)** the extent to which any prejudice could be lessened or avoided by:
>
>   >   **(A)** protective provisions in the judgment;
>   >
>   >   **(B)** shaping the relief; or
>   >
>   >   **(C)** other measures;
>
>   **(3)** whether a judgment rendered in the person's absence would be adequate; and
>
>   **(4)** whether the plaintiff would have an adequate remedy if the action were
>   dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Having considered these factors, the court concludes that NL Construction is not an

indispensable party. Again, the decision in *HB General Corporation* is instructive. In that case,

the court held that the limited partnership was not an indispensable party to the declaratory

judgment action because all three members of the partnership were parties to the litigation and,

therefore, the limited partnership was effectively represented by the existing parties and would

suffer no prejudice by virtue of being excluded. 95 F.3d at 1188. The court further concluded

that proper protective provisions in the judgment would ensure that the defendant limited partner was not prejudiced by the partnership's absence. *Id.*

In this case, NL Construction's interests are adequately represented because all three members of the company -- like the partners involved in *HB General Corporation* -- are parties to the litigation. Plaintiff's own claims against the defendants appear to be generally aligned, or at least not antagonistic to, NL Construction's claims. Thus, to the extent NL Construction has valid claims against the defendants, plaintiff can effectively advance those claims. On the other hand, to the extent plaintiff's interests are not in alignment with the interests of NL Construction, the defendants can presumably protect and defend the company's interests. *See HB Gen. Corp.,* 95 F.3d at 1193 ("If the Partnership has a claim against [the defendant] and the right to retain its real property, these interests will be effectively advanced by the HB entities. And even if the HB entities' interests are not entirely consistent with those of the Partnership, they are not antagonistic. Furthermore, to the extent the HB entities' interests diverge from the Partnership's interests, [the defendant] can protect them.[1]") (footnote omitted). In light of these circumstances, the court concludes that a judgment rendered in NL Construction's absence will likely be adequate and will not prejudice the company's interests.

In addition, the company's absence from this lawsuit will not prejudice the existing parties, because the court can shape the relief to ensure that the defendants are not subjected to multiple lawsuits. *See HB Gen. Corp.,* 95 F.3d at 1191 ("[T]he Partnership, like a marionette, cannot make a move unless some human being pulls the strings. And all the people who, under the Partnership Agreement, have the power to cause the Partnership to bring suit . . . are before the court. The court can therefore enjoin all the partners from bringing a subsequent suit on

behalf of the Partnership.").  The court also notes that, at least at this juncture, no counterclaims exist that would present concerns about piecemeal litigation.

Rule 19(b) also requires this court to consider whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.  Presumably, if a Rule 19 dismissal were to occur, plaintiff would pursue his action in state court.  Even if his remedy there would be adequate, however, the other factors discussed above support the conclusion that NL Construction is not an indispensable party to this litigation.

This conclusion remains valid notwithstanding the general rule that a corporation is considered an indispensable party to a shareholder derivative action.  *See HB General Corporation,* 95 F.3d at 1196 (citing authority and discussing the rule).  As the court in *HB General Corporation* explained, the character of a corporate entity is somewhat unique, and derivative shareholder claims are therefore materially distinguishable from derivative claims brought on behalf of a small partnership:

> Unlike partnerships, the corporation's status as a distinct jural entity is deeply rooted in our law; the bright lines that come with this status are one of the corporate form's major attractions.  Thus, a clear rule for joinder may be uniquely appropriate for the corporation context.  And, generally, shares in corporations are much more quickly and easily transferred than partnership interests, making a determination of whether the aggregation of stockholder's interests sufficiently represents the corporation extremely difficult.  Partnerships lack consistent entity-treatment, and, at least for small partnerships, the determination of whether the partners' interests align with those of the partnership is not difficult.  In this case, the Partnership consists of essentially two (though formally three) members, and we are easily able to determine that the individual partners effectively represent the Partnership.

95 F.3d at 1196.

For purposes of applying Rule 19(b), the structure of NL Construction is more analogous to the small limited partnership involved in *HB General Corporation* than a corporation.  As noted, NL Construction has only three members, all of whom are parties to this litigation.  In

light of the NL Construction's structure, the court can easily determine whether the members' interests align with those of the LLC. Accordingly, the rule that corporations are indispensable parties in shareholder derivative actions has no relevance here. *See R&R Capital, LLC v. Merritt*, Civil Action No. 07-2869, 2007 WL 3102961, at *9-10 (E.D. Pa. Oct. 23, 2007) (applying *HB General Corporation, supra,* and concluding that LLC was a necessary, but not indispensable, party to the lawsuit involving an alleged breach of the LLC's operating agreement, regardless whether plaintiffs' claim could be characterized as derivative).

For the reasons previously discussed, the court finds that it can proceed to exercise jurisdiction over this litigation "in equity and good conscience" without the joinder of NL Construction, whom this court regards as a necessary, but not indispensable, party. Because NL Construction need not be joined in this action, the parties remain completely diverse under 28 U.S.C. §1332(a).

## V.     Defendants' Rule 12(b)(2) Challenges

The court will next address the issue of personal jurisdiction. Here, each of the defendants moved to dismiss the second amended complaint for lack of personal jurisdiction.

### A.  Standard of Review

A motion to dismiss for lack of personal jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(2). "When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992); *Metcalfe v. Renaissance Marine, Inc*., 566 F.3d 324, 330 (3d Cir. 2009). Where, as here, the court does not hold an evidentiary hearing on the motion to dismiss, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have

its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales*, 384 F.3d at 97 (3d Cir. 2004); *see Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). Once the plaintiff establishes a prima facie case of personal jurisdiction, the burden shifts to the defendant to demonstrate that the exercise of personal jurisdiction is unreasonable. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 324 (3d Cir. 2007).

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, *Pinker [v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)], courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us*, 318 F.3d at 456 (*quoting Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Toys "R" Us*, 318 F.3d at 456 (quoting *Mellon Bank (East) PFSF, Nat'l Assoc. v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992)).

## B. Governing Legal Principles

"[T]o exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction; then, the court must apply the precepts of the Due Process Clause of the Constitution." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998). In Pennsylvania, the two steps of the inquiry merge, because Pennsylvania's long-arm statute allows the court to exercise jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 PA. CONS. STAT.

§5322(b); *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992). Personal jurisdiction is therefore proper if due process is satisfied.

"Due process requires that the defendant have 'minimum contacts' in the forum state and that the exercise of jurisdiction comport with 'traditional notions of fair play and substantial justice.'" *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The relevant minimum contacts must be based on "'some act by which the defendant purposefully avails itself of the privilege of conducting activities within Pennsylvania, thus invoking the benefits and protections of its law.'" *Id.* at 255 (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109 (1987)). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (quoting *Int'l Shoe Co.*, 326 U.S. at 320).

Personal jurisdiction may be exercised under two distinct theories based upon a defendant's general or claim-specific contacts with the forum. *Remick,* 238 F.3d at 255. "General jurisdiction is based upon the defendant's 'continuous and systematic' contacts with the forum and exists even if the plaintiff's cause of action arises from the defendant's non-forum related activities." *Id.* (citing *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 n. 3 (3d Cir.1996) (citations omitted)). General jurisdiction exists when the defendant's contacts with a forum are "so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quotations and citation omitted)(alteration in the original).

Specific jurisdiction, on the other hand, is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant "'should reasonably anticipate being haled into court'" in that forum. *Vetrotex,* 75 F.3d at 151 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). This fact-intensive inquiry has three parts: first, the defendant must have purposefully directed its activities at the forum; second, the litigation must arise out of or relate to at least one of those activities; finally, if the prior two requirements are satisfied, the court may consider whether the assertion of jurisdiction otherwise comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).

Where, as here, the claims asserted are for intentional torts, a "'slightly refined version'" of *O'Connor*'s three-part test applies. *Wolstenholme v. Bartels,* 511 F. App'x 215, 219 (3d Cir. 2013)(quoting *O'Connor,* 496 F.3d at 317 n.2). This test, known as the "effects test," derives from the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783 (1984), a libel case in which a California actress sued a reporter and editor who worked for the National Enquirer in Florida. In *Calder,* the Court held that California's assertion of jurisdiction over the defendants was consistent with due process. After examining the defendants' various contacts with California, it found them sufficient to satisfy due process because: (i) the defendants relied on phone calls to "California sources" for the information in their article; (ii) they wrote the story about the plaintiff's activities in California; (iii) they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and (iv) the "brunt" of that injury was suffered by the plaintiff in that State. 465 U.S. at 788–89.

Under the "effects test" as applied within the Third Circuit, the district court may exercise personal jurisdiction over a defendant if the plaintiff shows: "(1) the defendant

committed an intentional tort; (2) the forum state is the focal point of the harm suffered by plaintiff; and (3) the forum state is the focal point of the defendant's tortious activity, because the defendant expressly aimed its tortious conduct there." *Wolstenholme,* 511 F. App'x at 219 (citing *Marten v. Godwin,* 499 F.3d 290, 297 (3d Cir. 2007)). The Third Circuit Court of Appeals has "underscored that the scope of the law established in *Calder* is narrow, employing 'a conservative reading' to reflect the fact that *Calder* did not 'carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state.'" *Id.* (quoting *IMO Indus., Inc.,* 155 F.3d at 265); *see Marks v. Alfa Group,* 369 F. App'x 368, 370 (3d Cir. 2010) ("We have consistently emphasized that *Calder* should be applied narrowly."). Correctly applied, the test "'prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state,'" provided that "'the defendant did not expressly aim his conduct at that state.'" *Wolstenholme,* 511 F. App'x at 219 (quoting *Marten,* 499 F.3d at 297). In applying the test, courts are to first consider the "expressly aimed" element; only if it is satisfied must the other two elements be considered. *Id.* (citing *Marten,* 499 F.3d at 297).

Also relevant to this court's analysis is the Supreme Court's holding in *Walden v. Fiore,* 134 S. Ct. 1115 (2014). Therein, the Court reiterated that, "[f]or a State to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden,* 134 S. Ct. at 1121. Critically, "that relationship must arise out of contacts that the 'defendant *himself*' creates with the forum." *Id.,* at 1122 (quoting *Burger King Corp., v. Rudzewicz,* 471 U.S. 462, 475 (1985)) (emphasis in the original). The focus must be on the defendant's contacts with the forum itself rather than with persons who reside there. *Id.* at 1123 (citations omitted). "[A] defendant's relationship with a

plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* (citation omitted). Therefore, the "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 1125.

In *Walden,* the Court confirmed that "[t]hese same principles apply when intentional torts are involved." *Walden*, 134 S. Ct. at 1123. In the context of intentional torts, jurisdiction may not be predicated on "a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff." *Id.* (internal quotation marks and citation omitted). Instead, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* The Court pointed to its ruling in *Calder* as an illustration of how these principles are applied:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. . . . Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, . . . the defendants' intentional tort actually occurred in California. . . . *In this way, the "effects" caused by the defendants' article—i.e., the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to California, not just to a plaintiff who lived there*. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Id.* at 1123-24 (internal citations omitted) (emphasis supplied).

With these principles in mind, the court considers the contacts that each of the named defendants has with this Commonwealth.

1.  <u>Chase Bank</u>

Counts VI and VII of the second amended complaint assert claims against Chase Bank and Janosick for fraud and breach of fiduciary duties.  The Bank Defendants contend that neither general nor specific personal jurisdiction exists over them.  Plaintiff contends that both types of personal jurisdiction exist with respect to Chase Bank.

a.)  GENERAL JURISDICTION

In arguing that Chase Bank is subject to general personal jurisdiction, plaintiff makes four assertions concerning its activities within this forum.  First, plaintiff contends that Chase Bank "transacted business" in the Commonwealth of Pennsylvania, for purposes of 42 PA. CONS. STAT. §5322(a)(1), by entering into a mortgage agreement with plaintiff relative to his Pennsylvania property.  (*See* SAC ¶51 (alleging the delayed payment of unemployment compensation funds caused him "to fall behind in his mortgage obligations to Chase Bank in Pennsylvania").)  Second and relatedly, plaintiff asserts that, by virtue of his own mortgage "as well [as] thousands of others in the [C]ommonwealth of Pennsylvania," (Pl.'s Resp. Opp. Mot. Dismiss at 3, ECF No. 98), Chase Bank "[has] an interest in . . . real property in this Commonwealth," *see* 42 PA. CONST. STAT. §5322(a)(5), and also "[contracted] to insure . . . property . . . located within this Commonwealth."  *See id.* §5322(a)(6).  Third, plaintiff contends that Chase Bank's internet website "allows a registered user to make payments, transfer funds and otherwise manage accounts with Chase, including payments in Pennsylvania."  (Pl.'s Resp. Opp. Mot. Dismiss at 3, ECF No. 98.)  Fourth, plaintiff asserts that "the defendant's [sic] have previously availed themselves of this court as plaintiffs in multiple cases including 3:11-cv-44-KRG JP MORGAN CHASE BANK, N.A. v. STEWART TITLE GUARANTY COMPANY." (*Id.*)

Whether considered individually or in the aggregate, these activities do not establish that Pennsylvania has general jurisdiction over Chase Bank. To begin, plaintiff's reliance on 42 PA. CONS. STAT. §5322(a) as a basis for exercising general jurisdiction is misguided, as that section pertains to specific jurisdiction. *See Dicio v. Wells Fargo Bank, N.A.*, No. CV 15-676, 2015 WL 8276585, at *13 (W.D. Pa. Nov. 4, 2015) (noting that a plaintiff can establish "specific jurisdiction" under 42 PA. CONS. STAT. §5322(a) by showing that a defendant engaged in the forum related activities enumerated therein), *report and recommendation adopted*, No. CV 15-676, 2015 WL 8207486 (W.D. Pa. Dec. 7, 2015).[8]

In addition, the activities in which Chase Bank allegedly engaged did not create "'affiliations with the State [that] are so continuous and systematic as to render [Chase Bank] essentially at home" in this forum. *Daimler AG,* 134 S. Ct. at 761 (quoting *Goodyear, Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)). The United States Supreme Court has stated that, for corporations, "the place of incorporation and principal place of business are paradig[m] ... bases for general jurisdiction." *Daimler,* 134 S. Ct. at 760 (internal quotation marks and citation omitted)(alteration and ellipsis in the original). Chase Bank is a national banking association chartered under federal law and therefore has no state of incorporation. Nevertheless, if the rule that is applicable to corporate defendants is applied in this case, Chase Bank may be "fairly regarded as at home," and subject to general jurisdiction, in Ohio – the location of its principal place of business.

Other courts have reached the same conclusion. In *First National Bank of Pennsylvania v. Transamerica Life Insurance Company,* No. CV 14-1007, 2016 WL 520965, at *4 (W.D. Pa.

---

[8]  To the extent plaintiff argues that specific jurisdiction over Chase Bank exists by virtue of Chase Bank's mortgage-related activities in Pennsylvania, its website capabilities, or its previous lawsuits within the Commonwealth of Pennsylvania, the argument fails because plaintiff did not demonstrate that his claims arose from, or relate to, these forum-related activities.

Feb. 10, 2016), the court considered whether it had general jurisdiction over Chase Bank and concluded that it did not. The court reasoned that "if the general jurisdiction analysis set forth in *Goodyear* and *Daimler* applies equally to national banking associations as it does to corporations, then [Chase Bank] is subject to general jurisdiction only in the State where its principal place of business is located (Ohio), unless Third-Party Plaintiffs can demonstrate that this is an exceptional case."[9] The court specifically rejected the proposition that Chase Bank should be considered "at home" in Pennsylvania based upon factors such as the substantial annual revenue that Chase Bank generates in the Commonwealth, the hundreds of lawsuits that it had filed in this forum over the past decade, or the presence of an office here. *First Nat'l Bank,* 2016 WL 520965, at *6. It observed that "an entity 'that operates in many places can scarcely be deemed at home in all of them.'" *Id.* at *7 (quoting *Daimler,* 134 S. Ct. at 763 n.20). Because: (a) Chase Bank is not incorporated under Pennsylvania law, (b) its principal place of business is not in Pennsylvania, and (c) the claimants had not shown that the case was exceptional, the court in *First National Bank* concluded that general jurisdiction over Chase Bank was lacking. *Id.*; *accord Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (concluding that, under *Daimler,* a New York court could not exercise general jurisdiction over a bank that had branches in New York, where the bank was incorporated and headquartered elsewhere, and the case before the court was not an "exceptional" one; the bank's contacts were not "so continuous and systematic as to render [it] essentially at home" at home in New York).

---

[9] The Supreme Court has recognized that there might be "exceptional case[s]" in which a "corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 134 S. Ct. at 760 & n.19. The court, however, does not perceive any circumstances that would place this civil action within the realm of an "exceptional" case. *Cf. Perkins v. Benguet Consol Mining. Co.,* 342 U.S. 437 (1952) (holding that a foreign mining corporation was subject to general jurisdiction in the forum where it temporarily moved its principal place of business during wartime) (described as an "exceptional" case in *Daimer,* 134 S. Ct. at 760 & n. 19).

Like the court in *First National Bank,* this court concludes that general jurisdiction over Chase Bank is lacking. Accordingly, plaintiff cannot satisfy his Rule 12(b)(2) burden under that theory.

b.) SPECIFIC JURISDICTION

Plaintiff did not show that specific personal jurisdiction exists over Chase Bank. As set forth in the second amended complaint, most of Chase Bank's forum-related contacts involved actions taken by Janosick in her capacity as a small business specialist. According to the second amended complaint, Janosick provided payroll and other small business services to NL Construction and Native Link from her office in Spokane, Washington. (SAC ¶¶24, 47.) From that location, she allegedly permitted Thompson-Walk to improperly transfer funds out of NL Construction's account and improperly transfer NL Construction funds into Native Link's account. (*Id.* ¶¶95-96, 101-02.) Janosick was also allegedly responsible for revoking plaintiff's access to NL Construction's bank account, presumably at the direction of Walk, Thompson-Walk, or Nolan. (*Id.* ¶¶47, 110.) Thereafter, Janosick allegedly failed to provide requested documentation about the revocation and failed to honor checks that plaintiff wrote on NL Construction's account. (*Id.* ¶¶111-12.) All these allegedly improper actions were conducted from Janosick's office in Spokane, and even though they may have harmed plaintiff in this Commonwealth, there is no averment or evidence to suggest that Chase Bank, through Janosick, expressly aimed its tortious conduct here.

To the extent that Chase Bank, through Janosick, had direct contact with plaintiff, those contacts do not demonstrate Chase Bank's purposeful availment of this forum. According to the second amended complaint, plaintiff was present when NL Construction first opened its account at a Chase Bank branch office in Spokane, at which time Janosick took possession of certain business documents. (SAC ¶24.) This contact obviously occurred outside the Commonwealth of

Pennsylvania. Later, in February 2014, plaintiff called Janosick at the Spokane branch to inquire about why his access to the company's bank account had been revoked. (*Id.* ¶¶46-47.) This contact, however, was unilaterally initiated by plaintiff. As the Supreme Court explained in *Walden,* the minimum contacts necessary to create specific jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State." 134 S. Ct. at 1122 (emphasis in the original). The contacts cannot consist solely of the "unilateral activity" of a plaintiff. *Id.* at 1123.

In his brief, plaintiff attempts to establish a basis for specific jurisdiction by arguing that Janosick "failed to file income taxes in Pennsylvania and fraudulently filed Plaintiffs [sic] wage taxes in Washington State." (Pl.'s Resp. Opp. Mot. Dismiss at 4, ECF No. 98 (citing SAC ¶103).) In similar fashion, the second amended complaint states that Janosick failed to report and file employment-related taxes in Pennsylvania. (SAC ¶¶51, 103, 113.) Even if the court accepts these allegations as true, they do not suggest a possible basis for specific jurisdiction over Chase Bank. Like the situation in *Walden,* the "relevant conduct occurred entirely in [a foreign jurisdiction (in this case, Washington)], and the mere fact that [the defendant's] conduct affected [a] plaintiff[ ] with connections to the forum State does not suffice to authorize jurisdiction." 134 S. Ct. at 1126; *see Voltaix LLC v. NanoVoltaix, Inc.,* No. 09–142, 2009 WL 3230887, at *3 (D.N.J. Oct.1, 2009) (the defendant's awareness of a plaintiff's presence in New Jersey and its knowledge that the brunt of the harm would be felt in New Jersey only established foreseeability, and not the "deliberate targeting of the forum state required for the exercise of personal jurisdiction"). To the extent plaintiff is suggesting that Chase Bank, through Janosick, "expressly aimed" its tortious conduct at this Commonwealth by failing to file payroll or other taxes here, the argument is unpersuasive. As noted, the "effects test" is to be given a narrow

application. *See Wolstenholme,* 511 F. App'x at 219; *Marks,* 369 F. App'x at 370. Any suggestion that Janosick targeted Pennsylvania by filing payroll taxes in Washington rather than in Pennsylvania stretches the principle too far.

To the extent plaintiff relies on Chase Bank's online presence as a possible basis for finding *in personam* jurisdiction, the argument fails. The Third Circuit Court of Appeals has stated that

> "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts."

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 340 (3d Cir. 2009)(quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir.2003)); *see Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 397 (M.D. Pa. 2013)("[T]he Third Circuit indicated 'the requirement that the defendant intentionally interact with the forum state via the web site' is the crucial element to show purposeful availment in the internet context.")(quoting *Toys "R" Us, Inc.*, 318 F.3d at 452). Here, plaintiff failed to articulate any facts suggesting that Chase Bank specifically targeted Pennsylvania customers through its website, and, even if it did, plaintiff did not demonstrate that the instant litigation arose out of such forum-related activity.

At most, the facts in this case show that Chase Bank had an indirect relationship with plaintiff, a Pennsylvania resident, through NL Construction. However, the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden,* 134 S. Ct. at 1122. The Court in *Walden* noted that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. Similarly, "a defendant's knowledge of a plaintiff's existence in the

forum State or knowledge that its conduct may cause a plaintiff to experience harm in the forum

State are insufficient justifications for establishing specific jurisdiction." *First Nat'l Bank of*

*Pa.,* 2016 WL 520965, at *9; *see Walden*, 134 S. Ct. at 1124 (rejecting the appellate court's

conclusion that the necessary minimum contacts could be established by a defendant's

knowledge of the plaintiff's strong connections to a forum and a conclusion that the plaintiff had

suffered foreseeable harm there).

In sum, plaintiff did not allege facts that show "with reasonable particularity" the

possible existence of requisite minimum contacts between Chase Bank and Pennsylvania. *Toys*

*"R" Us,* 318 F.3d at 456. Under those circumstances, *in personam* jurisdiction over Chase Bank

is lacking.

### 2. Janosick

For essentially the same reasons, the court lacks *in personam* jurisdiction over Janosick.

Plaintiff implicitly concedes that this court has no general jurisdiction over Janosick, as he

asserts only the existence of specific jurisdiction. As discussed, plaintiff did not articulate facts

suggesting that Janosick engaged in tortious conduct that was specifically directed at this

Commonwealth. On the contrary, all the conduct on the part of Janosick about which plaintiff

complains occurred in Washington in the course of Janosick's professional relationship with NL

Construction, a Delaware LLC operating primarily in Washington. Plaintiff's limited individual

contacts with Janosick were initiated by plaintiff and occurred while Janosick remained present

in Washington. At most, plaintiff articulated facts showing only that Janosick had an indirect

business relationship with a Pennsylvania resident. Nothing in the second amended complaint or

appended exhibits suggests that Janosick took any action in an individual capacity that would

warrant a finding of *in personam* jurisdiction.

3.  The Pointguard Defendants

Counts IV and V of the second amended complaint assert claims against the Pointguard Defendants for breach of fiduciary duty and fraud.  With respect to these claims, plaintiff argues only that specific jurisdiction over the Pointguard Defendants is present.  According to plaintiff, the Pointguard Defendants' conduct falls within two provisions of Pennsylvania's long-arm statute:  (a) causing harm or tortious injury in the Commonwealth by an act or omission outside the Commonwealth, 42 PA. CONS. STAT. §5322(a)(4), and (b) shipping merchandise directly or indirectly into or through the Commonwealth, *id*. §5322(a)(1)(iii).

Assuming for the sake of argument that the Pointguard Defendants' conduct technically falls within the parameters of section 5322(a), this court still must evaluate whether the Pointguard Defendants' contacts with this forum are sufficient for due process purposes.  *See Prominent GmbH v. Prominent Sys., Inc*., No. 2:16-CV-01609, 2017 WL 1316362, at *16 (W.D. Pa. Apr. 10, 2017) ("[E]ven assuming that personal jurisdiction could somehow be maintained over [the defendants] under Pennsylvania's long-arm statute, that does not end the inquiry because the court 'cannot presume that jurisdiction is proper simply because the requirements of a long—arm statute have been met. . . .  [The court] must still determine whether the strictures of constitutional due process (i.e., minimum contacts and notions of fair play and substantial justice) would be observed by asserting jurisdiction.'")(quoting *Pennzoil Prods. Co. v. Colelli & Assocs., Inc*., 149 F.3d 197, 202 (3d Cir. 1996)) (third alteration in the original)(additional internal quotation marks omitted).

On that point, plaintiff's factual allegations fall short.[10]  According to the second amended complaint, Pointguard is a Washington professional limited liability company and

_____

[10] Jurisdiction should be normally considered on a defendant-specific basis.  *See Miller Yacht Sales v. Smith*, 384 F.3d 93, 95 n.1 (3d Cir. 2004).  Based upon the allegations in the second amended complaint, Pointguard acted only

Riggan, its only member, is a citizen of Washington.  (SAC ¶3.)  Native Link and NL

Construction – both Delaware LLCs -- hired the Pointguard Defendants in or around October

2013 to serve as acting CFO of both companies.  (*Id.* ¶33.)  Plaintiff was not involved in the

hiring and was informed about it after the fact.  (*Id.*)  After the Pointguard Defendants were

hired, plaintiff had only a few limited interactions with Riggan.  The first interaction occurred on

or after November 2, 2013, when discussions were held "to determine the company structure."

(*Id.* ¶34.)  The second interaction occurred when Riggan emailed plaintiff on February 5, 2014,

concerning plaintiff's request for access to the company's quickbook files.  (*Id.* ¶¶40, 44; SAC

Ex. 43.)  In his email, Riggan advised plaintiff that Thompson-Walk would soon be able to send

plaintiff a backup copy of the company's updated quickbook files and, shortly after that, plaintiff

would be receiving a K-1 form for income tax purposes.  (SAC Ex. 43, ECF No. 82-43.)

Plaintiff, however, did not receive these materials.  (SAC ¶44.)  After filing a complaint with the

IRS in September 2014, plaintiff received his K-1 form from tax year 2013, which Riggan

mailed to plaintiff's address in Pennsylvania.  (*Id.*)  As set forth in the second amended

complaint, plaintiff's claims against the Pointguard Defendants are predicated on allegations that

they:  (a) withheld from plaintiff certain filings or records that were pertinent to NL

Construction's business (SAC ¶¶76, 78, 85-92), (b) filed tax returns that (in some unspecified

manner) benefitted Native Link and harmed NL Construction (*id.* ¶77), (c) provided Thompson-

Walk, Nolan, and Native Link business advice that was beneficial to them and detrimental to NL

Construction (*id.* ¶80), and (d) failed to alert plaintiff to the other defendants' self-dealing.  (*Id.*

¶77.)

---

through Riggan.  Because the jurisdictional analysis for the Pointguard Defendants is basically identical, the court
will not separately consider each Pointguard Defendant.

Absent from the second amended complaint are any factual allegations suggesting that the Pointguard Defendants purposefully directed tortious conduct at this forum. On the contrary, the defendants' alleged misconduct involved activities that were conducted entirely *outside* the Commonwealth of Pennsylvania. There is no averment that Riggan ever entered the Commonwealth or that Pointguard, through Riggan, sought to do business here. The *only* connection that has been shown to exist between the Pointguard Defendants and this Commonwealth is the defendants' relationship with plaintiff himself, which arose incidentally as the result of the defendants' activities within the state of Washington. For purposes of a "minimum contacts" analysis, however, it is "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there" that matters. *Walden,* 134 S. Ct. at 1122 (citations omitted). Here, plaintiff failed to articulate facts that suggest the existence of the necessary "minimum contacts" between the Pointguard Defendants and this Commonwealth. Accordingly, he did not meet his burden of proving *in personam* jurisdiction over the Pointguard Defendants.

### 4. The NL Construction Defendants[11]

In his second amended complaint, plaintiff asserts four claims against the NL Construction Defendants: breach of contract (Count I), conversion (Count II), breach of fiduciary duty (Count III), and fraud (Count V). Defendants maintain that neither general nor personal jurisdiction is present. Plaintiff does not differentiate his jurisdictional arguments as they pertain to each of the NL Construction Defendants or each of the four claims asserted

---

[11] Defendants Thompson-Walk, Walk, and Native Link filed a joint motion and brief under Rule 12(b)(2) (ECF Nos. 85 and 86), while Nolan filed a separate Rule 12(b)(2) motion and brief. (*See* ECF Nos. 87 and 88.) For reasons that are unclear, NL Construction appears to have joined in the Rule 12(b)(2) motion filed by Walk, Thomson-Walk, and Native Link, even though it is no longer a defendant in the case. To the extent NL Construction seeks dismissal on personal jurisdiction grounds, the requested relief is denied as moot. Although Native Link joined in the motion of Walk and Thompson-Walk, its jurisdictional arguments will be separately addressed.

against these defendants. He appears to assert that both general and specific jurisdiction are present.

Preliminarily, the court concludes that it lacks general jurisdiction over Walk, Thompson-Walk, and Nolan in their individual capacities. In attempting to demonstrate a basis for general jurisdiction, plaintiff asserts that the defendants' contacts with Pennsylvania are "continuous and substantial." (Pl.'s Br. Opp. at 4, ECF Nos. 94 and 96.) He attempts to buttress this conclusion by reference to 42 PA. CONS. STAT. §5322(a)(1) ("Transacting any business in this Commonwealth") and §5322(a)(5) ("Having an interest in, or using, real property in this Commonwealth"), both of which pertain to specific, not general, jurisdiction. Under Pennsylvania's long-arm statute, general jurisdiction exists over individuals when they consent to the court's exercise of jurisdiction or are present or domiciled in the Commonwealth at the time process is served. 42 PA. CONS. STAT. §5301(a)(1). The Supreme Court has similarly recognized that, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Daimler AG,* 134 S. Ct. at 760. Here, plaintiff's own allegations establish that Walk, Thompson-Walk, and Nolan are domiciled outside this Commonwealth. (SAC ¶¶5-7.) They have not consented to this court's exercise of jurisdiction, and there is no contention that they were served with process while present in this forum. Thus, the court can dispense with plaintiff's assertion that general jurisdiction over these individual defendants is present. Instead, the court will focus its analysis on whether specific jurisdiction exists relative to each of the claims asserted against the NL Construction Defendants.

Relevant to the court's analysis are the affidavits of Thompson-Walk, Walk, and Nolan, which set forth certain jurisdictional facts. (*See* ECF Nos. 86-1, 86-2, and 88-1.) In all material respects, these affidavits are essentially identical, and the central facts can be gleaned from

Thompson-Walk's affidavit, which the court will cite for the sake of simplicity. (ECF No. 86-1.) As set forth therein, NL Construction is exclusively engaged in the solicitation and performance of construction-related contracts of various and sundry nature involving tribal lands and tribal entities largely, if not entirely located in the Pacific Northwest area, *i.e.,* Northern California, Idaho and Washington. (Thompson-Walk Affid. ¶4.) The contracts solicited and performed to date by NL Construction have involved the Native American Colville Confederacy situate in Washington, the Native American Karuk Tribe situate in Northern California, and the Native American Walpole Island Tribe situate in Ontario, Canada. (*Id.* ¶6.) NL Construction never bid on, performed, or otherwise solicited business within the Commonwealth of Pennsylvania. (*Id.* ¶7.) NL Construction has no agents, servants or employees located in this forum apart from plaintiff, and it has never been authorized or registered to do business here. (*Id.* ¶¶9-10.) On all occasions, for purposes of participating in business meetings affecting NL Construction or Native Link, plaintiff traveled to Spokane, Washington, which Walk describes as the business offices and headquarters of NL Construction. (*Id.* ¶12.) No officer or agent of NL Construction, including Thompson-Walk, Nolan, or Walk, ever traveled to Pennsylvania for the purpose of meeting with or conducting business with plaintiff. (*Id.* ¶11; *see* Walk Affid. at ¶10, ECF No. 86-2; Nolan Affid. at ¶11, ECF No. 88-1.)

### a) Breach of Contract (Count I)

The court applies the "traditional test" for specific jurisdiction, as outlined in *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312 (3d Cir. 2007), for purposes of analyzing the breach of contract claims in Count I. *See Maser v. Deeble,* Civil Action No. 17-99, 2017 WL 930795, at *4 (W.D. Pa. Mar. 9, 2017). Under this test, plaintiff must show that: (1) the defendant purposefully directed its activities at this forum, and (2) the litigation arises out of or relates to at

least one of those activities. *O'Connor,* 496 F.3d at 317. If these two requirements are met, the court can consider whether the exercise of jurisdiction would otherwise comport with fair play and substantial justice. *Id.*

In assessing whether it has specific jurisdiction, the court must consider "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." *Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001). "[A] contract alone does not 'automatically establish sufficient minimum contacts in the other party's home forum.'" *Grand Entm't Group v. Star Media Sales*, 988 F.2d 476, 482 (3d Cir. 1993) (quoting *Burger King*, 471 U.S. at 478). However, "[p]arties who 'reach out beyond [their] state and create continuing relationships and obligations with citizens of another state' are subject to the regulations of their activity in that undertaking." *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King*, 471 U.S. at 473). A defendant need not physically enter the forum because communications via email, mail, and telephone may suffice if such contacts through these media amount to deliberate targeting of the forum by the defendant. *O'Connor*, 496 F.3d at 317. On the other hand, the "unilateral activit[ies] of those who claim some relationship with a nonresident defendant" and "contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *Id*. (internal quotations and citation omitted).

In this case, plaintiff's breach of contract claims are ostensibly predicated on alleged breaches of the NL Construction operating agreement. Because the court has no information concerning the origin, location, or character of the initial contract negotiations, it cannot draw any conclusions about whether the NL Construction Defendants solicited plaintiff to engage in a business relationship or vice-versa, or where such discussions occurred. Nevertheless, the Third

Circuit Court of Appeals has stated that "it is not significant that one or the other party initiated the relationship." *Gen. Elec. Co.*, 270 F.3d at 151 (citing *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992)). "In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration." *Id*. In this case, the underlying agreement states that the parties' partnership would begin on May 1, 2012, and continue "indefinitely" until terminated by the terms of the agreement. (SAC Ex. 8, ECF No. 82-8.) The parties' course of conduct also suggests that the NL Construction Defendants knowingly embarked on a common commercial venture with plaintiff, a Pennsylvania resident, that would presumably extend over a substantial period of time.

The underlying agreement also states that plaintiff's home address in Pennsylvania would serve as both the "main office" of NL Construction and its mailing address. (SAC Ex. 8, ¶4.) To that end, plaintiff's home address was utilized as the business's address for purposes of establishing NL Construction's federal Employer Identification Number, registering NL Construction as a foreign LLC in Washington, and obtaining NL Construction's service provider identification number with the FCC. (*See* SAC ¶¶13-15, SAC Exs. 4 and 5.) Plaintiff contends that NL Construction initially had no commercial office space and, therefore, the company was originally operated out of his home in Pennsylvania, as well as Thompson-Walk's home in Washington. To that end, he claims to have performed "[a]ll engineering, permit documentation, remote technical support and most material purchases" from his home office, which was insured by the company. (SAC ¶¶25-26.) It appears plaintiff was paid for at least some of his work in Pennsylvania, as reflected in the Pennsylvania unemployment compensation board's ruling that plaintiff was entitled to receive unemployment benefits because he had earnings here.

The NL Construction Defendants deny that plaintiff ever had authorization to utilize his personal residence as an office or official address for the business; however, for present purposes, the court accepts plaintiff's averments as true and construes any disputed issues in his favor. *Miller Yacht Sales,* 384 F.3d at 97. At this juncture, the facts suggest that, at least for some period of time, NL Construction conducted part of its operations from plaintiff's home office in this Commonwealth and sent payments to him here.

In terms of the parties' post-contractual contacts, the record shows that none of the NL Construction Defendants ever travelled to this Commonwealth or personally solicited business here. To the extent in-person meetings were required, plaintiff travelled to Washington, the location from which Thompson-Walk and Walk operated. "In modern commercial business arrangements, however, communication by electronic facilities, rather than physical presence, is the rule. Where these types of long-term relationships have been established, actual territorial presence becomes less determinative." *Gen. Elec. Co*., 270 F.3d at 150-151 (citing *Burger King*, 471 U.S. at 476); *see Telcordia Tech Inc. v. Telkom SA Ltd*., 458 F.3d 172, 177 (3d Cir. 2006) ("[P]hysical presence in the forum is no longer determinative in light of modern commercial business arrangements; rather, mail and wire communications can constitute purposeful contacts when sent into the forum.") (citing *Burger King Corp., 471 U.S. at 476).

As outlined in the second amended complaint and appended exhibits, Walk and plaintiff had multiple post-contractual email communications concerning plaintiff's involvement in NL Construction, the issues that gave rise to their respective grievances, and the chain of events that culminated in plaintiff's purported "termination." At least some of these communications could be construed as instrumental to the alleged breach of the parties' agreement. In addition, some or

all of Walk's communications might be imputable to Thompson-Walk and Nolan, in light of their positions as members, managers, and owners of NL Construction.

Given the present state of the record, many questions remain concerning the NL Construction Defendants' ties to this forum. For present purposes, however, plaintiff has satisfied his minimal burden of articulating facts with reasonable particularity that suggest the possible existence of *in personam* jurisdiction over the NL Construction Defendants. The court will therefore deny the NL Construction Defendants' motion insofar as it relates to the breach of contract claim. The denial will be without prejudice to be reasserted, if warranted, following an opportunity for discovery of facts that may shed greater light on the nature and extent of the NL Construction Defendants' ties to this forum.[12]

### b) Conversion and Breach of Fiduciary Duty

In Count II of the second amended complaint, plaintiff asserts a claim against the NL Construction Defendants for alleged conversion of the company's assets and business opportunities, as well as his ownership interest in the company. (SAC ¶¶64, 65.) In similar fashion, plaintiff claims in Count III that the NL Construction Defendants breached their fiduciary duties by engaging in acts of "self-dealing" that were designed to deprive him of his ownership rights in NL Construction. (SAC ¶72.) Because conversion and breach of fiduciary duty are intentional torts, the court applies the *Calder* "effects test" to determine if sufficient minimum contacts exist with this forum.

Here, much of the NL Construction Defendants' allegedly tortious conduct occurred outside this forum. The alleged misappropriation of NL Construction's funds occurred in Washington, where the company's bank accounts were managed by Thompson-Walk. Similarly,

---

[12] The court notes that, among other things, it would be useful for plaintiff to obtain an official, executed copy of the company's operating agreement.

to the extent Walk, Nolan, or Thompson-Walk "converted" NL Construction's business "opportunities" or engaged in self-dealing by, *e.g.*, interfering with the company's contractual arrangements with third parties, the available facts suggest that this misconduct occurred outside this Commonwealth. Even though plaintiff might have felt the effects of the alleged misconduct in Pennsylvania, this is insufficient to establish *in personam* jurisdiction. *See Walden,* 134 S. Ct. 1125 ("*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum."); *see also Remick,* 238 F.3d at 258 ("'[S]imply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself . . . . The defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be satisfied.'") (ellipsis in the original) (quoting *IMO Indus., Inc.,* 155 F.3d at 265).

On the other hand, a liberal reading of the second amended complaint suggests that at least some of the NL Construction Defendants' allegedly tortious conduct was directed at this forum. For example, Walk's February 16, 2014 email to plaintiff regarding the election of Thompson-Walk as NL Construction's "manager," (SAC Exs. 47-48, ECF Nos. 82-47 and 82-48), and Walk's February 24, 2014 email to plaintiff forwarding the company's "termination" letter, (SAC Exs. 50 and 51, ECF Nos. 82-50 and 82-51), could be construed as acts of self-dealing that effectively deprived plaintiff of the benefit of his co-equal ownership interest in NL Construction. Because Walk ostensibly sent these communications on behalf of NL Construction (*see id.*), his conduct is likely imputable to Thompson-Walk and Nolan. For purposes of the *Calder* "effects test," it can reasonably be inferred that Pennsylvania is "the focal point of the harm suffered by plaintiff" and also the "focal point of the [aforementioned] tortious activity, because the [NL Construction Defendants] expressly aimed [their] tortious conduct [here]." *Wolstenholme,* 511 F. App'x at 219. Consequently, plaintiff articulated facts that are

sufficient to suggest that personal jurisdiction exists over the NL Construction Defendant with respect to the conversion and breach of fiduciary duty claims in Counts II and III.

    *c) Fraud*

In Count V of the second amended complaint, plaintiffs claim that the NL Construction Defendants committed fraud by suppressing or concealing information that they had a duty to disclose. (SAC ¶83.) In particular, plaintiff claims that the NL Construction Defendants knowingly concealed: (a) company tax returns and Schedule K-1s (SAC ¶¶85-87); (b) the company's Quick Book files (*id*. ¶88); (c) certain correspondence with the Colville Tribe that related to plaintiff (*id*. ¶89); (d) payroll and tax withholding information (*id*. ¶90); (e) unemployment compensation filings (*id*. ¶91); and (f) company bank account statements (*id*. ¶92). Nowhere in his second amended complaint or his brief does plaintiff articulate the specific representations on the part of the NL Construction Defendants that supposedly gave rise to a duty to disclose the foregoing information. Also unclear are the circumstances under which such communications occurred. At most, plaintiff offers only generic, conclusory allegations of a duty to disclose, which fail to satisfy the federal pleading standard. (*See* SAC ¶83 ("Defendants have suppressed and concealed certain material facts which they had a duty to disclose."); *id*. ¶93 ("Defendants had an independent duty to disclose these material facts since they undertook to make other affirmative representations about these matters, and were thus bound to make full and fair disclosure of all material facts.").) Because the record provides no basis for concluding that the NL Construction Defendants' directed "fraudulent" activity at this forum, plaintiff failed to meet his burden of demonstrating the existence of personal jurisdiction over the NL Construction Defendants with respect to the claims in Count V.

Nevertheless, at this juncture, the court will exercise pendent personal jurisdiction over the fraud claims against the NL Construction Defendants. "Under the doctrine of pendent personal jurisdiction, a court may exercise its discretion to hear claims as to which personal jurisdiction may otherwise be lacking if those claims arise out of a common nucleus of facts with claims as to which personal jurisdiction exists." *Rice v. Nova Biomedical Corp.*, 763 F. Supp. 961, 966 (N.D. Ill. 1991)(court exercising pendent personal jurisdiction over plaintiff's retaliatory discharge and defamation claims, where those claims were "substantially interrelated" with plaintiff's claim for intentional inference with an employment relationship), *aff'd*, 38 F.3d 909 (7th Cir. 1994). "In essence, once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction." *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) (citing *Anderson v. Century Prods. Co*., 943 F. Supp. 137, 145 (D.N.H. 1996)).

The doctrine of pendent personal jurisdiction has been applied in diversity cases where the district court has personal jurisdiction over some, but not all, of the plaintiff's state law claims. *See, e.g., Nat'l Oil Well Varco, L.P. v. Sadagopan,* Civil Action No. H-16-2261, 2017 WL 2957908, at *7 (S.D. Tex. July 11, 2017)(court had personal jurisdiction over intentional tort claims and exercised pendent personal jurisdiction over breach of contract claim that arose from the parties' same course of dealing); *Rosenberg v. Seattle Art Museum*, 42 F. Supp. 2d 1029, 1037-38 (W.D. Wash. 1999)(court had personal jurisdiction over intentional tort claim and exercised pendent personal jurisdiction over breach of contract and negligent misrepresentation claims); *Rice,* 763 F. Supp. at 696 (court exercising pendent personal jurisdiction over plaintiff's

retaliatory discharge and defamation claims, where those claims were "substantially interrelated" with plaintiff's claim for intentional inference with an employment relationship).

In deciding whether to exercise pendent personal jurisdiction, courts consider factors such as fairness to the defendant and the promotion of judicial efficiency. *See, e.g., Gen. Elec. Capital Corp. v. Mackzilla, LLC,* Civil Action H-15-2425, 2016 WL 1059529, at *6-7 (S.D. Tex. Mar. 17, 2016)(court exercised pendent personal jurisdiction over breach of contract claims arising from loan agreements without a forum selection clause where doing so would not "severely inconvenience[ ]" the defendants, who were already defending identical claims, and where it would be "more logical and more efficient" for all the claims to be tried together); *Rosenberg,* 42 F. Supp. 2d 1037-38 (court finding that "exercising jurisdiction over all of [defendant's third-party] claims . . . would promote the interests of justice and the efficient use of the parties' and the Court's resources"); *Rice,* 763 F. Supp. at 966 (court noting that "from the standpoint of fundamental fairness as to contacts with and convenience of the forum, the [defendant] loses nothing by being subject to our judgment on the [retaliatory discharge and defamation] counts," since he was "already properly before [the court]" on a related claim).

In this case, the fraud claims against the NL Construction Defendants arise out of the same nucleus of operative facts that serve as the basis for plaintiff's breach of contract, conversion, and breach of fiduciary duty claims – namely, a common course of dealing between plaintiff and the NL Construction Defendants. It is therefore appropriate for the court to exercise pendent personal jurisdiction over the fraud claims in Count V. *See Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 696 (S.D. Tex. 2011) (court exercising pendent personal jurisdiction over a breach of contract claim where all the plaintiff's claims against the defendant arose out of the parties' course of dealings over a period of several years). The court's

ruling in this respect will not unduly inconvenience the NL Construction Defendants, who are already properly subject to personal jurisdiction with respect to Counts I, II, and III,[13] and it will prevent piecemeal litigation against the NL Construction Defendants while promoting the efficient use of resources by the parties and this court. The NL Construction Defendants' motion to dismiss will be denied without prejudice.

5. <u>Native Link</u>

In Count II of the second amended complaint, plaintiff asserts a claim against Native Link for alleged conversion of NL Construction's assets and business opportunities and a resulting deprivation of his ownership interest in NL Construction. (SAC ¶¶64, 65.) Based on a liberal reading of plaintiff's brief in opposition, it appears that he may be asserting both general and specific jurisdiction as it relates to Native Link.

a) GENERAL JURISDICTION

Under the rule of *Daimler* as it has been applied to limited liability companies, Native Link will only be subjected to general jurisdiction in the state of its organization and principal place of business. Concerning this rule, one federal court in Pennsylvania has cogently explained that:

> [a]lthough the language of *Daimler* speaks only in terms of corporations, the subsidiary at issue in *Daimler* was Mercedes-Benz USA, LLC ("MBUSA"). *See Daimler*, 134 S. Ct. at 751. In determining whether the United States District Court for the Northern District of California could exercise general jurisdiction over Daimler-Chrysler Aktiengesellschaft ("Daimler"), the Supreme Court concluded that the district court could not exercise general jurisdiction over Daimler because "neither Daimler nor MBUSA is incorporated in California, nor

---

[13] In the event that the "anchor" claims are dismissed, the court would no longer have grounds to exercise pendent personal jurisdiction over the fraud claims against the NL Construction Defendants. *See Botefuhr*, 309 F.3d at 1274 (holding that the district court abused its discretion by retaining pendent personal jurisdiction over related claims once the "anchor" claim had been dismissed); *Rosenberg,* 42 F. Supp. 2d at 1038 ("Should [the third-party defendant] ultimately convince the Court that [the third-party plaintiff's] intentional tort claim fails as a matter of law, . . . there would be no justification for retaining jurisdiction over the remaining claims.").

does either entity have its principal place of business there." *Id*. at 761-62.  Even though MBUSA is an LLC, the Court looked to MBUSA's place of incorporation and principal place of business to determine whether it was essentially at home in California and thus subject to general jurisdiction in the State.

*Finn v. Great Plains Lending, LLC*, No. CV 15-4658, 2016 WL 705242, at *3 (E.D. Pa. Feb. 23, 2016) (holding that the reasoning of *Daimler* applies with "equal force" to a limited liability company).

Based upon the facts at issue here, this court lacks general jurisdiction over Native Link. According to the second amended complaint, Native Link is an LLC organized under Delaware law and lacks any agents, servants or employees in this Commonwealth.  (SAC ¶2.)  Prior to October 2013, Native Link allegedly operated out of the home of Thompson-Walk in Washington.  (*Id*. ¶25.)  At some point thereafter, the company leased space in Spokane, Washington.  (*Id*. ¶29.)  In his brief in opposition to Native Link's Rule 12(b)(2) motion, plaintiff makes the additional assertion that, in May 2012, Native Link was operating out of Florida and New York.  (Pl.'s Br. Opp. Mot. Dismiss at 2, ECF No. 96.)  In any event, it is clear from plaintiff's own averments that Native Link was not organized under the law of this Commonwealth and never maintained its principal place of business here.  General jurisdiction is therefore lacking.

b) SPECIFIC JURISDICTION

With regard to the issue of specific jurisdiction, the court applies the *Calder* "effects test" as it relates to the conversion claim in Count II.  As discussed, this claim is premised on the theory that Native Link misappropriated receivables, assets or business opportunities that rightfully belonged to NL Construction.  The question therefore becomes whether Native Link directed tortious activity toward this Commonwealth.

As pled in the second amended complaint, Native Link is a Delaware limited liability company that offers grant writing and consulting services for communications services and infrastructure to Native American governments. (SAC ¶17.) Thompson-Walk and Nolan are its members, while Walk serves as an officer of the company. (*Id.* ¶¶2, 5-7.) The company's contacts with this forum are scant. According to the second amended complaint, Native Link allegedly purchased business insurance from a Pennsylvania insurance agency in November 2012, listing both plaintiff's home address in Pennsylvania and Thompson-Walk's home address in Washington as insured locations, for reasons that are not clear. (*Id.* ¶26.) Even after changing to a Washington -based insurance broker in 2014, Native Link continued to maintain insurance on plaintiff's Pennsylvania residence until at least January 2015. In September 2013, Thompson-Walk and Nolan leased shared office space for Native Link and NL Construction in Spokane, Washington, and obtained insurance binders for both companies from the Pennsylvania insurance agency. (*Id.* ¶29.)

According to Thompson-Walk's affidavit, Native Link has never bid on contracts, performed contracts, or otherwise solicited business within the Commonwealth of Pennsylvania. (Thompson-Walk Affid. ¶7, ECF No. 86-1.) The company does not maintain an official address or office in Pennsylvania, it was never authorized or registered to do business in Pennsylvania, and, as plaintiff acknowledges, it has no agents, servants, or employees here. (*Id.* ¶¶8-10.) No officer or agent of Native Link ever traveled to this Commonwealth for the purpose of meeting with or conducting business with plaintiff. (*Id.* ¶11.) On all occasions, plaintiff traveled to Spokane, Washington, for purposes of participating in business meetings that might have affected Native Link. (*Id.* ¶12.) According to Thompson-Walk, Spokane, Washington is the location of Native Link's business office and headquarters. (*Id.* ¶12.)

Having construed the facts and allegations in the light most favorable to plaintiff, the court finds that *in personam* jurisdiction over Native Link is lacking. Conversion is an intentional tort, and the court applies the *Calder* "effects test" to determine if sufficient minimum contacts exist with this forum. Here, there is no indication that Native Link expressly directed its tortious conduct at this forum. The alleged conversions of NL Construction's receivables occurred in Washington, where the company's bank accounts were managed by Thompson-Walk. To the extent Native Link interfered with or "converted" NL Construction's business opportunities, *e.g.* by interfering with NL Construction's third-party contracts, that conduct also occurred outside this Commonwealth. Plaintiff's conversion claim also incorporates the allegation that plaintiff's ownership interest in NL Construction was misappropriated. However, Native Link would not have been in a position to directly dispossess plaintiff of his ownership interest NL Construction absent allegations -- not present here -- that Native Link functioned as the alter ego of Thompson-Walk and Nolan. Accordingly, personal jurisdiction over Native Link is lacking.[14]

## VI.      Defendants' Rule 12(b)(6) Challenges

In addition to challenging this court's subject-matter and personal jurisdiction, the Bank Defendants and the Pointguard Defendants each raised merits-based challenges pursuant to Rule 12(b)(6). Because the court found that it lacks personal jurisdiction over these parties, the court cannot address their Rule 12(b)(6) challenges. *Turner v. Shirey*, No. CV 16-3886, 2017 WL 1709811, at *4 (E.D. Pa. May 2, 2017)("Absent personal jurisdiction, this Court lacks the power to resolve the 12(b)(6) motion.")(citing *Lampe v. Xouth, Inc*., 952 F.2d 697, 700-01 (3d Cir. 1991)).

---

[14] In any event, there appears to be little added advantage to plaintiff if Native Link is included in this litigation, because Thompson-Walk and Nolan are already named as defendants.

**VII. Conclusion**

Based upon the foregoing reasons, the motions of the Pointguard Defendants and the Bank Defendants to dismiss the second amended complaint will be denied insofar as they are premised on subject-matter grounds and granted insofar as they are premised on personal jurisdiction grounds. The motions will be denied without prejudice to the extent they are asserted under Federal Rule 12(b)(6) for failure to state a claim. Native Link's motion to dismiss on personal jurisdiction grounds will be granted. The NL Construction Defendants' motions to dismiss for lack of personal jurisdiction will be denied without prejudice to be reasserted at a later time, if warranted.

An appropriate order follows.


Dated: August 17, 2017                                              /s/ Joy Flowers Conti
                                                                            Joy Flowers Conti
                                                                            Chief United States District Judge